# Illinois Official Reports

## Appellate Court

---

### *People v. Johnson*, 2021 IL App (1st) 171885

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTHONY JOHNSON, Defendant-Appellant. |
| District & No. | First District, Third Division<br>No. 1-17-1885 |
| Filed | May 19, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CR-7385(02); the Hon. Erica L. Reddick, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, Douglas R. Hoff, and Bryon M. Reina, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Stacia Weber, and Martin F. Moore, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE McBRIDE delivered the judgment of the court, with opinion.<br>Presiding Justice Howse and Justice Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant, Anthony Johnson, was charged with the first degree murders of the victims, William Junius and Lamont Matticx, in a May 2012 gang-motivated drive-by shooting. Defendant was tried at a bench trial on an accountability theory, based on evidence showing that he drove the vehicle from which Tywan Mason shot the victims. Defendant, who had never been involved in a gang and had no prior criminal history, introduced evidence through his own testimony and the testimony of several witnesses that defendant operated a freelance taxi service, through which he provided rides to people he knew or who were referred to him. Defendant testified that Mason was a customer who asked defendant for a ride and that defendant was unaware of Mason's intentions to shoot the victims during the course of the trip. Notwithstanding, defendant was found guilty of the first degree murders of the victims and was sentenced to a mandatory term of natural life imprisonment. We reverse defendant's convictions, finding reasonable doubt of defendant's guilt.

¶ 2    Most of the evidence presented at trial was undisputed, with the significant distinction between the parties' version of events centering around whether defendant had knowledge of Mason's plan to shoot the victims. That evidence generally showed that in 2012, there was an on-going conflict between the Gangster Disciples, who controlled the area near 54th Street and Hoyne Avenue in Chicago, and the Vice Lords, who controlled the area approximately a block away, at 54th Street and Damen Avenue. On May 10, 2012, the victims, Junius and Matticx, both of whom associated with the Gangster Disciples, were in front of the house located at 5358 South Hoyne Avenue, on the northwest corner of 54th Street and Hoyne Avenue. At approximately 4:45 p.m., defendant, who was not affiliated with a gang, drove his white Chevrolet Tahoe SUV eastbound on 54th Street and stopped in front of that corner. Mason, who was known to be a Vice Lord, fired several shots out of the driver's side window while sitting in the front passenger seat. One bullet struck Junius in the chest and another struck Matticx in the upper back. Both men died from those gunshot wounds. After receiving a tip regarding the license plate of the vehicle, police arrested defendant approximately two hours after the shooting. Mason, however, was not apprehended until approximately one year later.

¶ 3    At trial, Shavell McDougle testified that she was living at her grandmother's house near 54th Place and Hoyne Avenue in May of 2012. Several other people lived there, including her sister, DeShawn, and her nephew, Lamont Matticx, who was two months older than Shavell.

¶ 4    On the afternoon of May 10, 2012, Shavell received a phone call informing her that Matticx had been shot. Shavell ran to a home located at 54th Street and Hoyne Avenue, where she initially saw Matticx's friend Junius lying face down outside the house, with blood under his face and neck. Shavell was then directed to the porch, where she saw Matticx lying at the top of the stairs. Matticx's shirt was bloody, and one of the residents of the home was applying pressure to his chest.

¶ 5    Shavell asked Matticx who shot him, and Matticx replied, "Bo shot me. Tell them Bo shot me." Shavell knew Bo was Mason, whom she had met in 2008, and with whom she shared a nephew. Shavell had dated Mason for a few months, and she confirmed that she knew him to be associated with the Vice Lords gang. Shavell further testified that Matticx was a member of the Gangster Disciples and that the two gangs' territories intersected near the scene of the shooting.

¶ 6    Quendell McDougle, grandmother of Matticx, testified that she went to 5358 South Hoyne Avenue after learning of the shooting. Quendell saw Junius, whom she knew to be Matticx's friend, lying on the sidewalk, and saw Shavell and Matticx on the porch. Matticx was lying on the porch, gasping for breath, with blood on his chest. Quendell asked Matticx who shot him and he responded, "Bo shot me, Ment. *** Bo shot me. Bo did this. Bo shot me, Ment." Quendell explained that "Ment" was a nickname that Matticx called Quendell. Quendell had known "Bo" for about 10 years, but she did not know his real name.

¶ 7    Quendell talked to police when they arrived and spoke to them again almost a year later, in March 2013. At some point, police showed her a photograph of a person whom she identified as Bo.

¶ 8    Alex Ware testified that he is 57 years old. On May 10, 2012, between 2:30 p.m. and 3 p.m., Ware arrived at 54th Street, between Seeley Avenue and Damen Avenue, to help replace the alternator on a friend's truck. Ware testified that it was a nice day outside and there were a lot of "kids out" and a "good amount of activity going on." At some point, the friend went with another man to AutoZone while Ware stayed behind with the truck. While smoking a cigarette, Ware heard eight or nine gunshots coming from 54th Street and Hoyne Avenue, to his west.

¶ 9    Ware testified he saw a white truck, like a Tahoe or Suburban, parked at an angle facing east at the northwest corner of 54th Street and Hoyne Avenue. Ware saw smoke coming out of the driver's side window every time he heard a gunshot. When the shots stopped, the truck drove east on 54th Street toward both Ware and Damen Avenue.

¶ 10   Ware testified that the truck was going slow, like the driver did not have "a care in the world," and that the truck stopped when it reached him. Ware further testified that the driver, whom he identified in court as defendant, rolled down the passenger side window approximately one foot and pointed a revolver at him through the opened window. Ware described the color of the gun as "blackish." Ware heard the gun click, but it did not fire. He was about five feet away from the truck and saw only one person inside the vehicle. Ware testified that the vehicle was stopped for 10 or 15 seconds. After the gun clicked, the truck drove to the stop sign at 54th Street and Damen Avenue and waited for an opening in traffic before turning right, or southbound, onto Damen Avenue. Ware saw the truck's license plate while it was stopped at the sign, tried to memorize the number, and later wrote it down on a slip of paper.

¶ 11   Ware called 911 twice within two minutes of when the truck pulled away. The audio of those 911 calls was published for the court and admitted into evidence. In those calls, Ware told the 911 operator that the vehicle used in the shooting "shot right past" him. He did not report that the vehicle had stopped near him or that the driver had pointed a gun at him and pulled the trigger. After calling 911, Ware went back to work on his friend's truck.

¶ 12   Ware further testified that when police arrived at the scene, Detective Velasquez approached him and said that they "need[ed] some help here" and "[n]obody is talking." Ware told Detective Vasquez that he had written down some information, but explained that he could not give it to her there because, "That's Englewood. If they see me helping [the police], I can get killed." Ware slipped Detective Velasquez a piece of paper upon which he had written the truck's color, make, and two possible license plate numbers, along with Ware's name and phone number. Ware told her he would meet her at 55th Street and Damen Avenue. He did not tell Detective Velasquez that someone had pointed a gun at him.

¶ 13    Shortly thereafter, Ware met Detective Velasquez and her partner at 55th Street and Damen Avenue. Ware entered their unmarked car and talked to the officers while they drove him to defendant's house. In defendant's backyard, Ware saw the white Tahoe that defendant had been driving. Detective Velasquez then drove Ware to the station, where he viewed a lineup and identified defendant as the driver who pointed a gun at him.

¶ 14    The prosecutor showed Ware a photograph of the gun recovered from defendant's home and asked whether it was "similar or different" from the gun he saw pointed at him. Ware responded that it was a "similar color" and a revolver. "That's the kind of gun that was pointed at me."

¶ 15    On cross-examination, Ware testified that he described the incident multiple times to the police, an assistant state's attorney, the 911 operator, and a grand jury. Ware acknowledged that he told the 911 operator that the truck "shot right past" him. Ware did not tell the 911 operator that the truck stopped or that someone pointed a gun at him. He did not recall telling a detective at the station that the truck "began driving at a high rate of speed east on 54th" or that the vehicle stopped after passing him at 54th Street and Seeley Avenue. Ware acknowledged testifying before the grand jury that the truck "couldn't have been" stopped for "more than three to four seconds." Ware stated both that he never told anyone prior to trial that he heard the gun click and that he did testify before the grand jury that the gun clicked. Defense counsel impeached Ware's testimony with his grand jury testimony, indicating he did not previously testify he heard the gun click.

¶ 16    Ware also did not remember testifying before the grand jury that "the window was down" when the Tahoe stopped. He later testified that he was unsure whether the window was already rolled down before the vehicle stopped because he was focused on the gun.

¶ 17    On redirect examination, Ware testified that he did not tell the 911 operator about the vehicle stopping because he was trying to get help for the people who had been shot. Ware stated he wanted to remain anonymous because he did not want to get involved. Ware explained that, while he did not say the gun clicked during his video statement, he did say the gun was "out of rounds" and "didn't go off," which he knew because the gun clicked.

¶ 18    Detective Velasquez testified she arrived at the scene around 5 p.m., after other officers secured it. Detective Velasquez walked east on 54th Street and asked two men she saw working on a car if they had seen the shooting. In response, Ware and his friend denied being outside when the shooting occurred. As Detective Velasquez walked away, Ware placed a crumpled piece of paper in her hand. The paper had Ware's name and a phone number on one side. On the other, it said, "white suburban Yukon," and a plate number of "K15830." Under that it said, "8950." Detective Velasquez understood that to refer to two potential license plate numbers. Ware whispered to Detective Velasquez that he had seen the car and that she could call him.

¶ 19    About 15 minutes later, Detective Velasquez called Ware, who agreed to meet her at 55th Street and Damen Avenue. Detective Velasquez and her partner picked up Ware in an unmarked car. The officers relocated to have a conversation with Ware, at which point Ware told the officers that he was outside at the time of the shooting and that he heard gunshots. Ware said that he saw a white truck facing east with smoke coming out of driver's side window and that the truck drove east "at high rate of speed" after the shooting but slowed down before it approached Damen Avenue. Ware described the driver, who he said had pointed a gun at him. Ware also confirmed to Detective Velasquez that he had called 911.

¶ 20    Detective Velasquez subsequently learned that one of the plate numbers given by Ware matched a car registered to "[A]nt Johnson," identified by Detective Velasquez as defendant. Gang Sergeant Bocardo and his team then met Detective Velasquez and her partner and drove Detective Velasquez and Ware in a covert vehicle to defendant's house. At that point, they observed a Tahoe with license plate number K1588930 parked in the rear of defendant's home, which Ware identified as the one he saw during the shooting.

¶ 21    Less than a half hour later, at 6:50 p.m., Detective Velasquez learned that defendant had been arrested and that his house was searched by other officers. Detective Velasquez met defendant at Area Central, where she conducted a gunshot-residue test and conducted lineups containing defendant. Ware viewed a lineup at around 10:10 p.m. and subsequently gave a videotaped statement to an assistant state's attorney, in which he identified defendant as the driver.

¶ 22    Around 12:30 a.m., on May 11, 2012, Detective Velasquez met with DeShawn McDougle at her house to see if DeShawn could identify Mason as the shooter. Afterward, police issued an investigative alert for Mason, who was not arrested until May 13, 2013, about a year later.

¶ 23    On cross-examination, Detective Velasquez testified that Ware told her at the station that the driver was the only occupant of the Tahoe. Ware never told Detective Velasquez that he heard the gun click or that the driver rolled down the passenger-side window. Ware also did not mention those things during the video interview.

¶ 24    The parties entered several stipulations, including that defendant's grandmother consented to a search of their home and that a "blue steel revolver" was found under the bed of a rear bedroom. An evidence technician would testify that the gun was inoperable and that the bullets recovered from the scene were not fired from that weapon. The parties also stipulated regarding the results of gunshot residue tests, which did not detect any gunshot residue particles on either of defendant's hands.

¶ 25    The parties also stipulated to the introduction of defendant's Sprint Nextel phone records and the testimony of Gretchen Munger, who was employed by Sprint, regarding those phone records. The stipulation indicated, in total, that Munger would identify the phone number that was registered to defendant, that the phone records were a "fair and accurate copy" of the calls made and received on May 10, 2012, and that there were 16 phone calls between defendant's phone number and another specified phone number. The phone records generally show a series of phone calls between the two phone numbers shortly after midnight and a second series of phone calls in the early afternoon.

¶ 26    Defendant testified that, in May 2012, he lived at 5538 South Damen Avenue, which was in between the Back of the Yards and Englewood neighborhoods. Defendant lived in a two-flat house with his cousin, Tomiko Michelle Ham; his aunt, Barbara Brown; and his grandmother, Lucy Barnes.

¶ 27    Defendant testified that he had graduated from Gage Park High School and thereafter attended Lincoln Technical College, where he earned a certificate in automotive engineering. In 2012, defendant was looking for automotive jobs, and he had prepared a resume for that purpose, which was published to the court. While looking for full-time employment, defendant worked as a freelance taxi driver to make money.

¶ 28    Defendant testified that he started his taxi business by word of mouth, and his customers were either people he knew or people who had been recommended to him. If customers wanted

a ride, they would either call his cell phone or his grandmother's land-line phone or they would show up at defendant's house. Defendant would usually charge about $5 to take someone two or three blocks, $10 to $15 to drive someone 20 to 30 blocks, and $30 to $40 for longer trips. The price depended on how far the person was going and whether defendant would have to wait for them while they ran an errand. Defendant testified that his customers would sit either in the back or the front, based on their preferences, and it was not unusual for a passenger to choose to sit in the front passenger seat.

¶ 29     At the time of the shooting, defendant knew Mason as "Bo," but he did not know his real name. Mason had been recommended to defendant by a family friend, and defendant had previously given Mason four or five rides without incident. If Mason wanted a ride, Mason would either call defendant's cell phone or flag defendant down. Mason had never said or done anything that concerned defendant before May 10. Defendant testified that he knew Mason as a customer, not a friend. Defendant did not know where Mason lived, his friends or family, or whether he was in a gang.

¶ 30     Sometime on the evening of May 9, 2012, the day before the shooting, defendant gave Mason a ride after Mason called his cell phone. Later that night, Mason called defendant to say he might need another ride later. When asked on cross-examination about whether there had been 16 calls between Mason's and defendant's phones on the day of the shooting, defendant responded that he did not know. Defendant remembered talking to Mason on the phone once. After Mason told defendant the evening before that he might need a ride in the morning, defendant called Mason back, and Mason told him he was "fine" and did not need the ride.

¶ 31     In the afternoon of May 10, 2012, defendant went to the E&J Liquor Store (E&J) on 54th Street and Damen Avenue to buy cigarettes. Defendant saw Mason, who approached defendant and asked for a ride to 69th Street, by Sangamon and Morgan Streets. Defendant agreed. Mason paid defendant $10 and sat in the front seat. Both front windows were down. Defendant was driving with his seat leaned back, as usual, because defendant found it more comfortable.

¶ 32     When defendant and Mason arrived at the destination, Mason got out of the car and asked defendant to wait for him. Defendant stated that it was not unusual for a customer to ask him to wait. Defendant sat outside in the car and looked at his cell phone while waiting for Mason. Defendant did not see where Mason went and did not know what he was doing, who he was going to see, or why. When Mason returned to defendant's car, defendant did not see him with a gun. With Mason in the car again, defendant started driving back toward 54th Street and Damen Avenue, where he had picked up Mason.

¶ 33     Defendant drove west on 55th Street. As defendant was about to turn onto Damen Avenue, Mason told defendant to keep driving, so he did. Mason then told defendant to make a right turn onto Hoyne Avenue, two blocks after Damen Avenue, and defendant complied. Defendant drove north on Hoyne Avenue, but there was a concrete island that blocked access to 54th Street, and Mason directed defendant through side streets to navigate around the island. By navigating around the island, defendant ended up driving eastbound on 54th Street toward Hoyne Avenue, turning right on 54th Street at Mason's direction. Defendant then began to turn left to continue driving down Hoyne Avenue, but Mason told him to stop. Defendant stopped the car, believing that Mason was going to get out or that someone was coming to meet Mason. Defendant looked out of the driver's side window and saw someone on the sidewalk at the northwest corner of Hoyne Avenue. Defendant looked back to Mason and then outside again. Defendant started to ask Mason, "What's goin' on?" but only got out "what" before a gunshot

went off on the side of his face. Defendant saw that Mason was shooting in front of him, and defendant leaned back because he was taken by surprise and he did not want to get shot himself. Defendant denied that he leaned back to give Mason a better shot.

¶ 34 Defendant testified that Mason used an automatic gun. Defendant stated that he did not know much about guns and he believed casings are ejected out of automatic guns, but defendant did not see casings coming out. Defendant could not remember the color of the gun.

¶ 35 At some point, the gunfire ceased, and defendant "hit the gas" out of fear for his life, traveling east on 54th Street toward Damen Avenue. Defendant testified that he did not know if someone was going to shoot back at his car or whether Mason was going to shoot defendant. Defendant was not trying to help Mason escape, explaining that he did not kick Mason out of his car after the shooting because, "It d[id]n't look right" telling "a man with a gun *** what to do."

¶ 36 After leaving the scene, defendant did not stop until he reached the stop sign at 54th Street and Damen Avenue. Defendant denied having a gun, rolling down the passenger side window, pointing a black revolver at someone, or pulling the trigger. Defendant turned right onto Damen Avenue and got caught in traffic at a red light. At that point, Mason told defendant to let him out, and Mason exited the Tahoe. Defendant then drove to his home at 5538 South Damen Avenue, which was only a block or two away. Defendant parked in the back of his house like he always did. Before exiting his car, he looked for shell casings, but did not find any. Defendant denied that he was looking to discard evidence.

¶ 37 Defendant testified that he did not immediately call police because he wanted to talk to his cousin, Tomiko Michelle Ham, first. Ham worked for a law firm and defendant thought that she could help advise him of what to do. Defendant realized he was a witness and that Mason knew where he lived, so defendant feared for his own life and for his family. Ham arrived home about 20 minutes after defendant, but defendant was unable to talk to her privately because defendant's grandmother and aunt were at home. Defendant explained that he did not want to "excite" his grandmother or aunt because of their significant medical issues. Both defendant's grandmother and aunt had congestive heart failure, and his aunt used a defibrillator and was on dialysis. Police arrived about 10 minutes after Ham got home and arrested defendant.

¶ 38 Defendant testified he had never previously seen Mason with a gun, including earlier on the day of the shooting. The first time defendant knew that Mason had a gun was when Mason was firing it by defendant's face. Defendant and Mason did not have a conversation during the time Mason was in defendant's vehicle, and Mason never told defendant about a plan to shoot anyone.

¶ 39 Regarding the gun found at defendant's home, defendant testified that the gun had belonged to his father and it was given to defendant by his grandmother after his father's death. Defendant had never taken the gun outside of his home. The barrel was cracked and defendant did not think the gun worked.

¶ 40 On cross-examination, the State showed defendant a photo of defendant's cell phone screen showing a "frequently contacted" list. The photo included the name "Booq" along with a picture of Mason, as well as the names of defendant's fiancée, his friend, and his grandmother, which did not include photos of those individuals. The photo of defendant's phone did not display the associated phone numbers for any of those contacts. Defendant acknowledged that he had a picture of Mason in his cell phone, explaining that the picture helped him remember

who Mason was when he called to ask for a ride. Defendant did not have pictures linked to the contacts of his fiancée, his friend, or his grandmother because he did not need pictures of them to remember who they were.

¶ 41 Defendant denied that he was looking for the gun when he looked through his car after arriving home and stated that he could not remember whether he told detectives that he was looking for the gun. Defendant also denied changing his appearance, but acknowledged that he put on a different hat. Defendant testified that he was unsure if two hours had actually passed between his arrival home and his arrest.

¶ 42 Defendant denied that he spoke to a female detective at the station first, stating he first talked to two male detectives after his arrest. He remembered eventually talking to a female detective but recalled being read his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) by a male detective. Defendant acknowledged that when he was initially asked about his occupation, defendant answered that he was a mechanic and did not tell police that he was a cab driver. Defendant told them later that he was a cab driver.

¶ 43 Defendant testified that he could not remember if he told detectives the shooter's name was "Bill or some s***'" and acknowledged lying to detectives when he initially told them that he did not know the shooter's name. Defendant eventually told them the shooter's name was "Bo." On redirect, defendant explained that he did not initially identify Mason because he was scared for his life and for the lives of his family members and thought that he would be putting people in danger by discussing what happened. Defendant also acknowledged that he told the detectives that someone named Jamal called him and asked him to pick up Mason on May 10 and that was a lie. Defendant disclosed this to the detectives after he signed a consent to search form for his cell phone.

¶ 44 Defendant told the detectives that he did not know Mason, which he maintained was true. Defendant explained that, although he had met Mason before the shooting, he did not know him personally. Defendant denied telling the detectives that he had never picked up Mason before May 10, and agreed that, if he had said that, it would have been a lie.

¶ 45 Defendant agreed that he told police that he picked up Mason outside E&J. He did not tell police that it was actually "a couple houses down from E&J" until the police said that they would check E&J's surveillance video.

¶ 46 Additionally, defendant conceded that he lied when he told detectives that he did not see Mason shoot inside his car, additionally explaining that he did not actually see Mason fire the initial shot.

¶ 47 The prosecutor asked defendant about his statement to police that, when he stopped at the scene, he was "looking forward because I'm the one, you know, to see if anything is coming." Defendant denied that he was acting as a lookout for the shooting, explaining that he was "talking about traffic" and paying attention to "what was going on in traffic" as a driver.

¶ 48 The prosecutor also asked defendant if he told detectives that he could not go to 54th Street and Hoyne Avenue, saying "You know, what I'm thinking like, okay, what the f*** we doing down here? I can't really—I really can't go down here." Defendant denied telling them that he could not go to 54th Street and Hoyne Avenue, explaining that he was talking about 54th Street and Winchester Avenue, where someone previously threw a brick at his car. Defendant stated that someone in the area of 54th Street and Winchester Avenue had a car like his and that he was unsure whether the owner of that car was a Vice Lord. Defendant did not remember telling

police that he knew "another Vice Lord that got the same kind of truck as me." Defendant also denied telling police he could go into the neighborhood where the shootings occurred, but that Mason could not. He did not remember saying, "They don't know me so, you know, I can go there." Defendant further testified that Mason never told him he could not go to 54th Street and Hoyne Avenue. Mason did tell defendant he could not go to 55th Street and Damen Avenue, where defendant lived. Mason never told defendant why he could not go there, and defendant never asked. Defendant agreed that if he told them that Mason said he could not go to 54th Street and Hoyne Avenue, it would be a lie. Defendant explained generally that the police interviews were "real confusing" and the police were "getting me confused with the situation" and "telling me a lot of different stuff."

¶ 49 Defendant stated that he knew that there were a lot of shootings in the neighborhood, but he denied knowing which gang controlled the area around his house. Defendant testified that he had never been in, or affiliated with, a gang. He did not know much about the gangs in his area, even though he had lived there his whole life, because they were not part of his life. He did not spend a lot of time on the streets before May 10 because "it wasn't [his] thing" and he had "responsibilities to take care of." None of defendant's friends were in gangs, nor did he associate with any gang members.

¶ 50 Defendant had heard of the Gangster Disciples and thought there were probably Gangster Disciples near his home, but he did not know. Defendant testified he did not know whether Mason was a Vice Lord. When detectives asked if defendant thought Mason was a Vice Lord, he told them, "I don't know, probably, I don't know."

¶ 51 Defendant testified he was unsure of where Mason's girlfriend lived and whether he had a girlfriend. He stated he was unsure of whether he told detectives he thought Mason's girlfriend lived around 57th Street and Seeley Avenue. He denied telling detectives he normally picked up Mason at 57th Street and Seeley Avenue and drove him to E&J. While he did not normally pick up Mason at 57th Street and Seeley Avenue and take him to E&J, he had done that.

¶ 52 Defendant did not remember if Mason would usually have a "blunt" or cup of liquor when defendant picked him up and did not recall telling detectives that he did.

¶ 53 Virgil Johnson Jr. testified that he is 64 years old and lived on the northeast corner of 54th Street and Seeley Avenue in 2012. Virgil testified that around 4:45 p.m., on May 10, he was cutting his grass when he heard gunfire. Virgil heard multiple gunshots but was unsure of how many. Virgil then saw a white SUV drive east past him on 54th Street toward Damen Avenue.

¶ 54 Virgil testified that he saw two occupants in the SUV, a driver and a front passenger, both of whom were young black men. The passenger was holding up an automatic, silver pistol. The SUV slowed down as it approached Damen Avenue in order to turn right, but it did not stop or slow down before that. Virgil watched as the vehicle traveled east on 54th Street, and nothing was obstructing his view. Virgil estimated that the vehicle was traveling at a "steady speed" of about 15 to 20 miles per hour.

¶ 55 Virgil viewed lineups at some point after the shooting, and he was not able to identify anyone.

¶ 56 On cross-examination, Virgil testified that he did not actually see the shooting or smoke coming out of the driver's side window. On the day of the shooting, Virgil told detectives he was unsure of the direction from which the shots came. Virgil knew there were "gangs over there," but he did not know what gangs they were or what territories they occupied.

¶ 57    Brande Mitchell testified that she was 24 years old and that defendant was a good friend who lived across the street. Mitchell had known defendant for seven or eight years and hung out with defendant almost daily. Mitchell was aware of gang activity in the neighborhood and knew that defendant "had nothing to do with" gangs.

¶ 58    Mitchell knew defendant did "neighborhood cabbing" and had called upon him for rides on multiple occasions. As one example, Mitchell recalled that in February 2012, defendant drove her to the hospital to visit her father. Although Mitchell usually sat in the front seat when defendant gave her a ride, Mitchell sat in the back seat during that trip because her stepmother and sister were also with her. Mitchell paid defendant $15 for driving her to the hospital. Mitchell stated that defendant's prices would vary and, because Mitchell was a friend, defendant would sometimes ask her to just "give him what [she] c[ould]."

¶ 59    Mitchell also testified that defendant always positioned his seat so that it was "leaned back a little bit" while driving because he was "on the heavier side."

¶ 60    On cross-examination, Mitchell denied that she ever dated defendant, stating he was "like a big brother to [her]." Mitchell had not talked to defendant since this case started, and she did not know anyone named "Bo."

¶ 61    Tyrone Craft testified that he is 49 years old. Craft had friends who lived around 55th Street and Damen Avenue, including defendant. Craft stated that defendant was known in the neighborhood for giving taxi rides. He had given Craft 10 to 12 rides. Craft never called defendant for a ride; he just flagged him down when he saw him. Craft sat in both the front and back of a defendant's vehicle and usually paid defendant $5 or $10. Craft had not spoken to defendant since the case started.

¶ 62    Carl Brown testified that he was 54 years old and was defendant's neighbor and friend of 15 years. Brown knew defendant as a cab driver and auto mechanic. Defendant had previously fixed Brown's nephew's car and his mother's car. He had also driven Brown to run errands five or six times, including to Home Depot. Brown would sit in the front of defendant's white four-door truck and pay defendant for the ride.

¶ 63    Anthony Jenkins testified that he is 29 years old and defendant was a friend from high school. Jenkins testified that he would call defendant for rides to work when his car broke down. Jenkins could not estimate how many times defendant had driven him in total but testified that it was "quite often" and "a few times per month." Jenkins would sit in the front seat and usually paid defendant about $15.

¶ 64    In rebuttal, the State called Detective Eugene Schleder, who testified that he met defendant at Area Central around 12:17 a.m. on May 11, 2012, and that he talked to defendant about his car with Detective Velasquez. Detective Schleder talked again with defendant, along with Detective Robert Garcia. After Detective Garcia read defendant his *Miranda* rights, the officers video recorded an interrogation, several clips of which the State published for the court to impeach defendant's testimony. In defendant's statement, defendant told police that he never picked up Mason before May 10, that a Vice Lord had the same kind of truck as he had, and that Mason would have a cup of liquor or a "blunt" on him when defendant picked him up. On cross-examination, Detective Schleder testified that defendant made no statement admitting that he knew Mason was going to shoot out of his car.

- 10 -

¶ 65   In closing, the State argued that Mason was the actual shooter and that defendant was accountable. Regarding defendant's motive to assist Mason in committing the shooting, the prosecutor stated,

> "Whether he did it because he's a part of the gang or whether he did it for money knowing that Tywan Mason was a Vice Lord going into [Gangster Disciple] territory he knew exactly what he was doing. *** He did give a ride to Tywan Mason. And again even if he did it for money knowing what he was doing that's accountability."

¶ 66   The State maintained that the call log showing "numerous" phone calls between Mason and defendant that morning established that defendant and Mason were planning the murders and that defendant's driving Mason to a different location and waiting while he went into a house demonstrated defendant's awareness that Mason was retrieving the gun from that location. The State further argued that defendant's maneuvering his car at an angle and leaning back in his seat showed defendant's objective to give Mason "a better shot." The State argued that defendant drove away with Mason "because that's his accomplice," and defendant attempted to shoot Ware after the offense because defendant realized that Ware was a witness. Finally, the State argued that the evidence showed that, following the shooting, defendant searched his car to get rid of evidence and changed his appearance by putting on a hat.

¶ 67   Defense counsel argued that the State failed to prove defendant shared Mason's criminal intent or that there was a common criminal design. The actions relied on by the State to show defendant's knowledge, like stopping the car at an angle and leaning back in his seat, were consistent with defendant's account that he was simply following Mason's directions and that he feared being shot himself. Counsel argued that the State's entire case rested on Alex Ware's incredible testimony, which was contradicted by the testimony of Virgil Johnson Jr. and Detective Velasquez. Counsel also asserted that the phone calls between defendant and Mason were consistent with Mason looking for a ride and that almost all the calls were made by Mason to defendant. Moreover, where the calls were generally less than 30 seconds long, they were "long enough for someone to dial the number, call, [and] listen for it to ring" but not long enough for a significant conversation. The length of the calls indicated that "[i]f there was [a] conversation[ ] *** it wasn't about planning anything. *** It was about getting a ride."

¶ 68   Following closing arguments, the trial court noted that the case was "largely circumstantial," further explaining that "much of the State's case *** hang[s] on the testimony of Anthony Ware." The court pointed out that the defense evidence included "diversions between" Ware's trial testimony and his testimony before the grand jury, as well as a "diversion in the account with the 911 call."

¶ 69   The court also considered the State's evidence that defendant "partnered with Mr. Mason in accomplishing" the offense, specifically "the evidence of the phone records indicating *** phone calls between the defendant and Mr. Mason [numbering] 16 [on] the same day of the event." The court noted that the State asked the court to "consider that these show the planning." Although the court acknowledged that it was "clear we don't know what conversation if any occurred during those phone contacts," the court stated that it could consider "the timeframe that the calls lasted, [and] the number of calls between the two."

¶ 70   The court explicitly "consider[ed] the [sufficiency of the] State's evidence alone *** given the enormous challenges to the evidence [and] the defense's theory that [defendant] unknowingly participated in the event that resulted in" the deaths of the victims. Nonetheless, the court concluded that the charges "ha[d] been proven with proof beyond a reasonable doubt"

and entered a finding of guilty on all counts. Following a sentencing hearing, the court imposed a mandatory natural life sentence without parole, pursuant to section 5-8-1(a)(1)(c)(ii) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2012) (mandating a natural life sentence where a defendant is "found guilty of murdering more than one victim")).

¶ 71     In this appeal, defendant contends that the evidence was insufficient to support his convictions because the State failed to prove a common criminal design or that defendant shared Mason's criminal intent. Defendant additionally argues that his natural life sentence is unconstitutional as applied to him. We address defendant's challenge to the sufficiency of the evidence first. For the reasons discussed below, we reverse defendant's convictions because the State failed to prove defendant accountable for the first degree murder of the victims beyond a reasonable doubt.

¶ 72     The due process clause of the fourteenth amendment to the United States Constitution requires that a person may not be convicted " 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' " *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). When presented with a challenge to the sufficiency of the evidence, it is this court's function to carefully examine the evidence, giving due consideration to the fact that the trier of fact observed and heard the testimony of the witnesses. *People v. Sykes*, 341 Ill. App. 3d 950, 982 (2003). While it is the unique responsibility of the trier of fact to weigh the evidence, assess the credibility of the witnesses, and resolve any conflicts in the testimony (*People v. Mejia*, 247 Ill. App. 3d 55, 62 (1993)), the trial court's findings are not conclusive (see *People v. Ross*, 229 Ill. 2d 255, 272 (2008); *People v. Smith*, 185 Ill. 2d 532, 541 (1999)). Great deference is given to such findings, but a criminal conviction cannot be upheld if the evidence is so unreasonable, improbable, or unsatisfactory as to give rise to a reasonable doubt regarding an essential element of the offense that the defendant has been found guilty of committing. *People v. Adair*, 406 Ill. App. 3d 133, 137 (2010); *People v. Clinton*, 397 Ill. App. 3d 215, 220 (2009); *People v. Mocaby*, 378 Ill. App. 3d 1095, 1097 (2008) (if " 'the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt,' " the conviction must be reversed (quoting *Smith*, 185 Ill. 2d at 542)); *People v. Siguenza-Brito*, 235 Ill. 2d 213, 225 (2009); *People v. Ash*, 102 Ill. 2d 485, 493 (1984) (when the evidence is "not sufficient to create an abiding conviction that [the defendant] is guilty of the crime charged," a reviewing court must "reverse the judgment" (internal quotation marks omitted)).

¶ 73     In this case, the trial court found defendant guilty of the first degree murder of the victims solely on a theory of accountability, based on defendant driving the vehicle that was used in the offense.

¶ 74     A person is accountable for the conduct of another if, "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2012). The State may prove a defendant's intent to promote or facilitate an offense "by showing either (1) that the defendant shared the criminal intent of the principal, or (2) that there was a common criminal design." (Emphasis omitted.) *People v. Fernandez*, 2014 IL 115527, ¶ 21. "[U]nless the accomplice *intends* to aid the commission of a crime, no guilt will attach." (Emphasis in original and internal quotation marks omitted.) *People v. Perez*, 189 Ill. 2d 254, 268 (2000).

¶ 75    In reviewing the sufficiency of the evidence, we initially note that there was no direct evidence of defendant's intent to assist Mason in the drive-by shooting. As the court recognized, the case against defendant was circumstantial. Defendant did not make any inculpatory statements acknowledging his awareness of Mason's intentions. Additionally, there was no evidence of any motive defendant had to participate in the gang-related shooting. See *People v. Starks*, 2014 IL App (1st) 121169, ¶ 47 ("While it is not necessary for the State to prove a motive for a crime [citation], the lack of any identifiable motive can certainly give rise to a reasonable doubt."); *People v. Washington*, 375 Ill. App. 3d 1012, 1032 (2007) (where the appellate court was "left with no idea as to defendant's role in, let alone his intent to encourage or aid" the shooting, "the State did not meet its lofty burden of establishing guilt beyond a reasonable doubt"). The undisputed evidence at trial showed that defendant was 26 years old at the time of the offense, had graduated from high school and earned a certificate from a technical college, was not a gang member, and had no criminal history.

¶ 76    Apparently recognizing the challenge posed by a lack of identifiable motive for defendant to participate in this offense, the State speculated during closing arguments that defendant aided Mason in committing the crime for one of two reasons—either he was actually a gang member or he "did it for money." Given the total lack of evidence that defendant had any gang involvement and the significant evidence presented that he affirmatively did not, it was utterly inappropriate for the State to make such a suggestion. *People v. Jackson*, 2012 IL App (1st) 102035, ¶ 18 ("A prosecutor *** may argue fair and reasonable inferences drawn from the evidence at trial. [Citation.] However, he may not argue facts not based on evidence in the record."). Moreover, the only evidence presented at trial regarding defendant being paid for giving Mason a ride was that Mason gave defendant $10 when he got into the car. It is similarly preposterous to suggest that defendant accepted payment of $10 to assist Mason in a double murder, particularly when the evidence showed that defendant generally earned between $5 and $40 for other cab rides.

¶ 77    While the evidence and testimony presented at trial was extensive, that evidence was, for the most part, undisputed. There is no question that defendant drove the car from which Mason shot and killed the victims. The only truly contested testimony was that of Anthony Ware. It is this testimony that the State refers to as the strongest evidence of defendant's guilt and the "most indicative of his intent to participate in the murders." The trial court similarly observed that the State's case "h[u]ng on the testimony of Anthony Ware."

¶ 78    Because Ware's testimony was so critical to defendant's convictions, we will consider that evidence first. Although the question of witness credibility is normally for the trier of fact, a reviewing court need not turn a blind eye to obvious and inherent infirmities in a witness's testimony, and we will not hesitate to reverse the fact finder's determination if we find the testimony is contrary to the laws of nature or universal human experience. *People v. Jones*, 81 Ill. App. 3d 798, 802 (1980). The deference afforded to a trier of fact's findings does not remove this court's obligation to review the trial testimony and to reverse where that testimony is so incredible and unsatisfactory as to raise a reasonable doubt as to the defendant's guilt. *Ross*, 229 Ill. 2d at 272 (a trier-of-fact's acceptance of certain testimony, or its conclusion that evidence supported certain inferences, "does not guarantee the reasonableness of its decision").

¶ 79    The substance of Ware's testimony is essentially that, after observing the shooting, the white Tahoe drove toward him and stopped in front of him. Ware saw one person in the car, the driver, whom he identified as defendant. Defendant rolled down the passenger side window

and pointed a "blackish" colored revolver at him. The State relies on this testimony to contend that, "in the midst of the getaway," defendant pointed his black revolver at Ware and fired, in an attempt to silence Ware as "a witness to the shooting."

¶ 80    Ware however, described the incident multiple times—to 911 dispatchers, to the police, and to the grand jury—with repeatedly inconsistent accounts. Ware called 911 twice, almost immediately after the Tahoe drove away from him, but never mentioned that the car stopped near him or that the driver, or anyone else, pointed a gun at him. Instead, Ware related that the Tahoe "shot right past" him. Ware also did not initially tell Detective Velasquez that the car had stopped next to him or that someone had pointed a gun at him. Detective Velasquez testified that Ware told her the truck fled east after the shooting, only mentioning that it slowed down as it approached Damen Avenue. Ware's inconsistent versions of events, and his omission of critical facts at a time when a person normally would have disclosed them, casts doubt on the believability of his testimony. See *People v. Williams*, 329 Ill. App. 3d 846, 854 (2002) (holding that impeachment by omission occurs when a witness has an opportunity to make a statement, under circumstances where a person would normally make it, but does not).

¶ 81    Ware's account was also inconsistent regarding whether defendant rolled down the passenger side window upon stopping the vehicle, the speed at which the Tahoe drove away from the scene, whether he heard the gun click, and how long the vehicle was stopped in front of him. These multiple impeachments undermine the reliability of Ware's already dubious testimony. See *People v. Rodriguez*, 312 Ill. App. 3d 920, 933 (2000).

¶ 82    Importantly, Ware's testimony that he only saw one person in the car as it approached 54th Street and Damen Avenue is contradicted by all the other undisputed evidence presented at defendant's trial. This testimony was so obviously inaccurate that it casts doubt on the rest of his testimony. Ware's testimony was also impeached by Virgil Johnson Jr., the only other witness to testify that he watched the vehicle as it fled from the scene of the shooting, who, unlike Ware, was accurate in his observation of two people in the vehicle. Virgil testified that he saw the passenger holding an automatic, silver pistol and that the vehicle did not make the stop Ware testified to, explaining that the car traveled at a "steady speed" of about 15 to 20 miles per hour and did not stop or slow down at all before it approached Damen Avenue to turn right. Virgil's account was consistent with the initial version of events Ware related in his 911 calls and to Detective Velasquez.

¶ 83    Given the undisputed inaccuracy on a central aspect of Ware's account, his changing renditions, and the extensive impeachment of his testimony, we conclude that Ware's testimony was too unreliable to support defendant's convictions. See *In re Christian W.*, 2017 IL App (1st) 162897, ¶¶ 79-83 (where a conviction rested on testimony from an incredible witness lacking sufficient reliability, the State's evidence was so unsatisfactory as to justify a reasonable doubt of the defendant's guilt); *Smith*, 185 Ill. 2d at 542, 545 (reversing defendant's murder conviction where the State's case "hinge[d] upon the testimony" of a single witness and "no reasonable trier of fact could have found [the witness's] testimony credible" based on "the serious inconsistencies in, and the repeated impeachment of, [her] testimony"). In concluding that Ware's testimony was incredible, we also observe that there is no indication that the State took Ware's account seriously enough to charge defendant with an offense related to his alleged attempt to shoot Ware.

¶ 84    We also reiterate that to prove accountability, the State must show that defendant's participation in the offense took place *before or during* the offense. See 720 ILCS 5/5-2(c)

- 14 -

(West 2012); *People v. Taylor*, 164 Ill. 2d 131, 140 (1995). Participation after the fact is not enough. See *People v. Dennis*, 181 Ill. 2d 87, 104 (1998) ("A person who forms the intent to facilitate an escape only after [the offense] has occurred can neither aid nor facilitate the conduct which is an element of [the offense]."). Accordingly, a court may consider a defendant's actions following the offense but should evaluate those actions insofar as they raise an inference of defendant's prior or concurrent participation in the offense. See *People v. Johnson*, 260 Ill. App. 3d 558, 564 (1994). Those actions do not establish an independent basis to hold defendant accountable for an offense that has already been completed.

¶ 85    In *People v. Johnson*, 2014 IL App (1st) 122459-B, ¶ 7, the defendant was driving two friends around his neighborhood while drinking liquor and smoking marijuana. At some point, he stopped near another car in an attempt to buy more marijuana. *Id.* One of his friends exited his car and shot the driver of the other car. *Id.* After a jury trial, the defendant was found accountable for the shooting. *Id.* ¶ 11. On appeal, the defendant argued the evidence was insufficient to prove him guilty of murder based on accountability. *Id.* ¶ 127.

¶ 86    In reversing the defendant's conviction, this court observed that the defendant's statement to police did not indicate that defendant knew the shooter was armed and intended to commit a crime. *Id.* ¶¶ 128, 136. Moreover, the shooter testified he never told the defendant that he planned to shoot the decedent or that he was armed. *Id.*¶ 133. Furthermore, there was no evidence the defendant "acted to facilitate the shooting as it occurred," since he did not "assist" the shooter "during the crime" and the defendant's flight from the scene was insufficient to prove accountability. *Id.* ¶¶ 133-34. Because "there was neither evidence of a prior intent or advance planning by defendant to transport [the shooter] to shoot the victim, nor was there evidence that defendant participated in a common criminal design," the evidence was insufficient to sustain the defendant's conviction based on accountability. *Id.* ¶¶ 133-34, 161; see also *People v. Taylor*, 186 Ill. 2d 439, 448 (1999) (finding defendant was not accountable for murder, even though he drove the shooter to and from the scene and knew the shooter had a firearm).

¶ 87    The State asks this court to find proof of defendant's intent in circumstances similar to those rejected in *Johnson*, 2014 IL App (1st) 122459-B. Specifically, the State contends that defendant's intent is apparent in evidence showing that defendant fled from the scene with Mason and that he "searched his SUV after the shooting." The State claims that there was a reasonable inference that defendant disposed of cartridge casings because only one casing was found by an evidence technician at the scene. The State also contends that defendant did not alert anyone about the murders of the victims.

¶ 88    Even if we were to accept the State's proposed inferences that defendant intended to help Mason escape following the shooting or that he destroyed evidence, it does not prove that defendant aided and abetted Mason before or during the commission of the crime, where defendant's purported assistance did not occur until after the offense was complete. The mere presence of a defendant at the scene of the crime is insufficient to make a defendant accountable, even if it is coupled with the defendant's flight from the scene or knowledge that a crime has been committed. *People v. Velez*, 388 Ill. App. 3d 493, 512 (2009); *People v. Martinez*, 242 Ill. App. 3d 915, 923 (1992); see also *Taylor*, 186 Ill. 2d at 448 (the defendant was not accountable, although he drove the shooter to and from the scene and although he knew that the shooter had a firearm, where the "defendant neither had knowledge that [the shooter] intended to fire his gun upon exiting the vehicle nor made any effort to aid [the

- 15 -

shooter] in the discharge of the weapon"). Even conduct that helps avoid capture, like helping an offender escape or disposing of evidence, does not, in and of itself, give rise to legal accountability for murder. *Taylor*, 186 Ill. 2d at 448; *Johnson*, 2014 IL App (1st) 122459-B, ¶ 148 ("Although driving the shooter away from a murder assists the shooter in avoiding capture, that conduct in itself does not hold the driver legally accountable for murder. [Citations.] That offense is accessory after the fact [citation], not first degree murder."); *Dennis*, 181 Ill. 2d at 107.

¶ 89      Although the State claims that defendant did not report the shooting to the police, we note that defendant was arrested within approximately two hours, leaving little time to act, and the short delay was explained by defendant, as he was seeking legal advice during that time and was scared for his and his family's safety. Moreover, once the police arrived, defendant generally cooperated, voluntarily signing a consent to the search of his phone. Such conduct by defendant shows a lack of a guilty mind and cuts in defendant's favor. See *Johnson*, 2014 IL App (1st) 122459-B, ¶ 153.

¶ 90      We also find no evidence of defendant's conduct before or during the offense that would indicate a prior intent or advance planning to assist Mason in shooting the victims or participation in any common criminal design. The evidence relied on by the State to show defendant's participation is entirely too speculative to establish defendant's guilt beyond a reasonable doubt. See *People v. Davis*, 278 Ill. App. 3d 532, 541 (1996) ("A person's liberty is an endowment that is too valuable to be lost on speculation of wrongdoing.").

¶ 91      First, the State relied on phone records to support an inference that defendant and Mason were preparing for the later shooting. Specifically, at trial, the State emphasized that there were 16 phone calls between defendant's phone and Mason's phone on the day of the shooting. The State asked the trial court to "infer that there is planning in these murders because of the cell phone records *** show[ing] that there were numerous contacts," further arguing that the evidence showed that "these two know each other quite well and spent quite a bit of time together." The court explicitly considered these 16 phone calls between Mason and defendant when it went through its decision.

¶ 92      As stated above, in introducing defendant's phone records, the parties stipulated to the testimony of a Sprint employee, who would identify defendant's phone number, testify that the phone records were a "fair and accurate copy" of the calls made and received on May 10, and state that there were 16 phone calls between defendant's phone number and another specified phone number. The stipulation, however, does not identify the other phone number as belonging to Mason, and this court has found no other evidence in the record to establish Mason's possession of that phone number.

¶ 93      At oral argument in this case, the State conceded that there was no evidence in the record to establish that the other phone number belonged to Mason. The State also conceded that defendant never "explicitly" stipulated to Mason's possession of that phone number, instead arguing that there was a "tacit admission" that the phone number belonged to Mason by defense counsel's argument based on those calls.

¶ 94      Additionally, although the parties stipulated that there were 16 phone calls, a close review of the call records appears to dispel that notion. Specifically, the call logs appear to show that calls made by the phone number alleged to belong to Mason dialed a different number, which was then forwarded to defendant's phone number. In those instances, there appears to be duplicate entries, with separate logs from when the phone call was initiated and when it was

- 16 -

"routed" to defendant's phone number. Many of these entries indicate that the calls began seconds after one another, while the prior "call" was still ongoing. Additionally, where a phone call was routed to voicemail, there appears to be yet another duplicate entry. Accordingly, a phone call to defendant that went to voicemail appears to be included in the call log in three different entries—first, the initial call; second, when it is forwarded to defendant's phone number; and third, when the call is routed to voicemail. Once the apparent duplicates are removed, it appears that there were 8 calls exchanged, not 16.

¶ 95    Three of those calls occurred around midnight—two calls from the phone number alleged to belong to Mason to defendant's phone (lasting 39 seconds and 12 seconds) and one 22 second phone callback from defendant's phone. This series appears to be consistent with defendant's testimony that he called Mason back after giving him a ride on the evening of May 9. Later, in the early afternoon, there appears to be four phone calls from that phone number to defendant's phone, and the first two, around 12:53 p.m. and 12:55 p.m., were routed to voicemail. Those calls last, respectively, 32 and 33 seconds. Then there are two more phone calls from Mason's alleged phone number to defendant, at 12:57 p.m. and 12:59 p.m., lasting respectively, 29 seconds and 48 seconds. Finally, the records indicate one phone call from defendant to that phone number at 1:49 p.m., lasting 21 seconds. This evidence is very different from the "numerous" calls from which the State asked the trial court to infer that Mason and defendant were plotting a double murder.

¶ 96    At oral argument, the State also agreed that the phone records clearly show 8 phone calls between the phone number alleged to belong to Mason and defendant's phone number—not 16. Importantly, however, the State argued to the trial court that it should consider these 16 phone calls between Mason and defendant as evidence of their prior planning, and the court did so, explicitly noting the evidence of 16 phone calls and that the court could consider the "number of calls between the two" in finding defendant guilty. The State now concedes that there were not 16 phone calls, and that, for the remaining 8, there is no evidence in the record to establish that the calls were between defendant and Mason.

¶ 97    Nonetheless, even if we were to accept the State's contention that there was a "tacit admission" that the phone calls were between defendant and Mason, the State's proposed inference is too great a leap. There was no evidence regarding the substance of the phone calls. In fact, the call log does not establish whether defendant and Mason spoke at all or whether the phone rang for 12 to 48 seconds without an answer. Given the very short duration of all the phone calls, we cannot conclude that they support an inference that defendant and Mason were planning a drive-by shooting. Instead, the calls are more consistent with the defense theory that Mason was attempting to reach defendant to secure a ride for his own purposes.

¶ 98    The State also relied on evidence showing that defendant took Mason to a house on 69th Street before driving him to 54th Street and Hoyne Avenue, where the shooting occurred, claiming a "reasonable inference" that Mason retrieved the gun used in the shooting from this location. This claim is entirely speculative. There was no evidence establishing where Mason obtained the gun he used during the shooting. Mason may have picked up the gun at this location, or he may have had it prior to entering defendant's vehicle. Regardless, there was no evidence that defendant knew Mason had a gun, and defendant testified that he did not see Mason with a gun at any time before he fired it at the victims.

¶ 99    Moreover, while there was no evidence that defendant knew Mason had a gun, even if the court could infer such knowledge, it still would not prove that defendant had a specific intent

to promote or facilitate an offense. In *Taylor*, 186 Ill. 2d at 442, the defendant was driving an automobile when his passenger showed him that he was carrying a gun. After the defendant nearly collided with another vehicle and the occupants of the other vehicle exited to check for damage, a heated exchange occurred between them and the defendant's passenger. *Id.* at 442-43. The passenger then exited the vehicle, fired his gun at the other vehicle, and reentered the vehicle, and the defendant drove them away. *Id.* at 443.

¶ 100    At trial, the defendant testified that the passenger never told him why he wanted the defendant to stop the vehicle, nor did the passenger give the defendant any reason for exiting the vehicle or firing his gun. *Id.* at 443-44. The defendant was subsequently convicted of aggravated discharge of a firearm based on a theory of accountability, and the appellate court affirmed. *Id.* at 444. Our supreme court reversed the conviction, finding the evidence insufficient because the defendant stopped the vehicle upon his passenger's request and there was no evidence that the defendant knew the passenger's intentions upon exiting the vehicle. *Id.* at 447. Even though the defendant knew his passenger had a gun, he did not know that his passenger intended to shoot anyone, and the defendant's actions since the shooting began were merely directed at effectuating an escape and not at promoting the commission of a crime. *Id.*

¶ 101    The facts in the instant case are even weaker than those found insufficient in *Taylor*. Here, defendant stopped the vehicle at Mason's request, and there is no evidence that defendant knew of Mason's intentions, or even that he had a gun.

¶ 102    Finally, the State argues that the evidence showed that, during the offense, defendant "angled his SUV in such a manner" and "reclined in his seat to give Mason a clear shot at the victims." Defendant's act of moving his body away is entirely consistent with his stated surprise and fear at his passenger shooting a firearm in front of his face and does not establish his prior knowledge of Mason's criminal intent or the intent to promote or facilitate the offense's commission. Additionally, had defendant been aware of Mason's plans, defendant likely would have driven in the opposite direction so that Mason would have had a "clear shot" through the passenger window rather than over defendant seated in the driver's seat.

¶ 103    In sum, we find no evidence that defendant participated in Mason's plan to shoot the victims before or during the offense. Our obligation as a reviewing court cannot be met by turning a blind eye to the insufficiency of the State's evidence. *Davis*, 278 Ill. App. 3d at 544 ("[A] conviction based on speculation falls below the [boundary] that protects all of our citizens from losing their liberty except by proof beyond a reasonable doubt. Our oath of office demands that we disregard speculation and do what we know must be done in accordance with the cool, dispassionate and courageous application of the law."). Defendant has consistently maintained that he did not know Mason was armed or what Mason planned to do when defendant agreed to give him a ride. The evidence of defendant's actions before and during the offense are entirely consistent with that explanation, and the State presented no competent evidence contradicting defendant's account. As a result, the State has failed to prove beyond a reasonable doubt that defendant is accountable for the first degree murders of the victims. See *Taylor*, 186 Ill. 2d at 447.

¶ 104    For the foregoing reasons, we conclude that the State's evidence was so unsatisfactory as to justify a reasonable doubt of defendant's guilt. *Siguenza-Brito*, 235 Ill. 2d at 225; *Smith*, 185 Ill. 2d at 542. Because we are reversing defendant's convictions, we need not address his constitutional challenge to his mandatory natural life sentence.

¶ 105        For the foregoing reasons, we reverse defendant's convictions. Mandate to issue *instanter*.

¶ 106        Reversed.