2021 IL App (2d) 180587-U
No. 2-18-0587
Order filed August 26, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Stephenson County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-33 |
| KAHILL G. BROWN, | ) ) ) | Honorable Michael P. Bald, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE BRIDGES delivered the judgment of the court.
Justices Zenoff and Schostok concurred in the judgment.

**ORDER**

¶ 1     *Held*:  Sufficient evidence supported defendant's convictions on one count of aggravated discharge of a firearm within 1000 feet of a school and one count of aggravated battery with a firearm, where the co-defendant's testimony identifying defendant as the shooter was not so flawed as to be rendered completely unreliable, and circumstantial evidence supported defendant's conviction.

¶ 2     Brown was charged with one count of aggravated discharge of a firearm within 1000 feet of a school (720 ILCS 5/24-1.2(a)(2) (2016)) and one count of aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (2016)). Following a bench trial, Brown was convicted of both counts. Brown argues that the State failed to prove his guilt beyond a reasonable doubt. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                A. Shooting and Chase

¶ 5      On January 23, 2017, around 2:05 p.m., officers from the Freeport Police Department were in the area of Walnut Avenue and Broadway Street in Freeport, Illinois, having just completed executing a search warrant on a nearby residence. Officer Matthew Anderson was in his marked police SUV and Detective Timothy Krieger was in front of him in an unmarked tan police vehicle.

¶ 6      As they turned onto Broadway Street facing towards Walnut Avenue, they heard two or three gunshots followed by a brief pause and then another eight to ten shots. The sound seemed to come from just north of their location. Seconds later they observed a red Chevy Malibu followed by a black Chevy Tahoe traveling south on Walnut Avenue at high speeds. They turned on their lights and sirens and began to pursue the vehicles, with the Malibu leading the chase followed by the Tahoe, then Krieger, then Anderson. As the vehicles passed the intersection of Homer Street and Walnut Avenue, they were recorded by a security camera at the home of Issac Larmoreux. The footage showed that at that point in the chase the Tahoe's windshield was intact and the front passenger side window was down. As the vehicles passed the area of Walnut Avenue and American Street, the officers heard additional gunshots. Krieger saw that the shots were fired from the passenger side of one of the vehicles but could not tell from which vehicle they originated.

¶ 7      At the intersection of Walnut Avenue and Winnifred Street, the vehicles split up, with the Tahoe turning east on Winnifred Street and the Malibu continuing south on Walnut Avenue. Krieger turned off to pursue the Tahoe, while Anderson continued to follow the Malibu.

¶ 8      The Malibu made its way towards the intersection of Empire Street and Float Avenue where it stopped briefly, and John Carew exited from the rear passenger door. The Malibu then turned east on Empire. Anderson looked to see if there was oncoming traffic and observed the

Tahoe also traveling east on Empire Street pursued by a marked police car and Krieger's vehicle. He then radioed in the information regarding the direction of the Malibu, and got out of his SUV to approach Carew, who had collapsed in the grass. He handcuffed Carew and asked who was in the Tahoe, and Carew said he had been shot. Anderson asked who shot him and who was in the Malibu, but Carew said that he did not know the answer to all of Anderson's questions. Anderson lifted Carew's shirt and saw two bullet holes in his lower back. He did not see any exit wounds on Carew's front, but did see what appeared to be a bullet partially protruding around Carew's ribs. Anderson called for an ambulance and stayed with Carew until it arrived.

¶ 9      The Tahoe pursued by Krieger turned south onto Oak Avenue, from Winnifred Street, then east onto Garfield Street, then north onto Chicago Avenue, then east onto Fuller Street, then north onto Carroll Avenue, before turning east onto Empire Street. At this point Officer Ryan Wagand, who was traveling east on Empire Street in his marked squad car, interposed himself between Krieger and the Tahoe. Two blocks down the Malibu pulled out from Float Avenue onto Empire Street in front of the Tahoe. Officer Anderson's squad camera captured the four vehicles as they drove past Float Avenue and Empire Street. The front passenger window of the Tahoe was down, and someone could be seen driving the vehicle. However, no one was visible in the front passenger seat.

¶ 10      At the intersection of Empire Street and Galena Avenue, the vehicles split up again. The Malibu, now pursued by Krieger, continued down Empire Street, while the Tahoe turned South onto Galena Avenue.

¶ 11      Krieger pursued the Malibu on a circuitous route until it eventually came to a stop at Shawnee Street and Liberty Avenue. There were two occupants in the vehicle, Paris Williams and Damon Shipp, who were then taken into custody. Williams was taken from the driver seat and

3

Shipp from the front passenger seat. Officers discovered a .40-Caliber SR 40 Ruger handgun on driver seat floor.

¶ 12    Wagand continued to pursue the Tahoe South on Galena Avenue. The Tahoe then turned east onto U.S. Route 20, where it nearly collided with a passing semi-truck. Wagand briefly lost sight of the Tahoe as the semi-truck passed. This was the only point in the chase where the Tahoe was out of sight of the pursuing officers. Wagand then pursued the Tahoe east on U.S. Route 20 at speeds approaching 100 miles per hour. The Tahoe then turned north onto Rock City Road. As the Tahoe passed through the town of Ridott, Wagand observed something being thrown from the vehicle. The object was later recovered and found to be a small bag containing what appeared to be cannabis, though the substance was never tested. The Tahoe eventually crossed a bridge over the Pecatonica River at which point the Tahoe turned east onto East River Road. The Tahoe appeared to try to turn around but ended up getting stuck in a ditch on the north bank of the river.

¶ 13    Wagand stopped on East River Road, exited his vehicle, and circled around it. At that point he observed persons exiting the passenger side of the vehicle. He drew his service weapon and ordered them to show their hands. At the time Wagand believed he saw three persons exiting the vehicle, but he later testified that it was possible he only saw two. Wagand saw one subject run south into the river and one subject stay with the vehicle. He then observed someone running east into a copse of trees along the bank of the river. Wagand chased after the individual running east, who turned out to be Marco Moore. As he was giving chase, Corporal Robyn Stovall passed him in her squad car. Wagand caught up to Moore approximately a quarter mile from the Tahoe. As Wagand caught up to Moore he could be heard saying, "They got me. Police got me. I'm going to jail. Alright?" Wagand and Stovall then took Moore into custody. Wagand's and Stovall's squad cars were equipped with squad cameras, which recorded these events. Wagand wore a body camera

which also captured the events.

¶ 14 Officer Douglas Hill arrived at East River Road shortly after Wagand did. As he arrived, he observed Wagand pursuing Moore eastbound, but he did not see Moore. He then observed Brown in the river up to his chest and ordered him to exit the water. Hill testified that he did not see anyone else in the area of the river or heading towards the bridge. As Brown was coming out of the water, Hill observed Brown carrying a black object in his right hand. Hill ordered him to drop it, which he did. Hill testified that he did not know what the object was, but that it might have been a phone. Hill's squad car was equipped with a squad camera that captured the events.

¶ 15 Deputy Chief Matthew Summers arrived at the scene and parked his unmarked squad car on the north end of the bridge. After exiting his vehicle, he took a few steps back up onto the bridge to observe the scene. He saw Hill in the process of instructing Brown to exit the river but did not see Brown. He also had a view of the river and did not see anyone in the river or running towards the bridge. He then went to assist Hill with taking Brown into custody.

¶ 16 As Wagand, Hill, and Stovall arrived at the scene, their squad cameras captured a white Chrysler traveling eastbound on East River Road pull out onto the southbound lane of Rock City Road, and then turn around and begin traveling west on East River Road. Stovall identified the vehicle as belonging to Tristan Euell, who Moore would identify as the owner of the Tahoe.

¶ 17                          B. Search of the Area

¶ 18 Based on Wagand's belief that he had seen three people exit the Tahoe, police continued to search the area for a third person. Stovall asked Moore how many people were in the vehicle, and he said there were only two, that he was the driver and Brown was in the passenger seat. As Brown was being taken into custody Wagand asked, "How many were in the car with you?" To which Brown replied, "Just two." Wagand then asked of the suspected third person, "He went

through the water, right?" To which Brown replied, "That was me." A search was made of the area, which included officers from the Freeport Police Department, the Stephenson County Sheriff's Office, volunteer firefighters, Anderson's K-9 unit, and a boat. However, no third person was located.

¶ 19                             C. Physical Evidence

¶ 20    Carew was taken to a hospital and treated for three bullet wounds. Two bullets were removed from his body and given to an attending police officer. There was also one through and through wound where a bullet entered and exited Carew's body. As a result of that wound, one of his kidneys had to be removed.

¶ 21    From the area of Walnut Avenue and Pleasant Street where the first round of shots was fired, officers recovered nine 9-millimeter shell casings from the west side of Walnut Avenue. Across the street on the eastern side of Walnut Avenue was a fence which formed the boundary of the playground of St. Joe's Elementary School. The furthest 9-millimeter shell casing was found 58 feet from the school property. Officers recovered five .40-caliber shell casings from the area of Walnut Avenue and American, where the second round of shots had been fired.

¶ 22    Both the Tahoe and Malibu were impounded, and a search warrant for both vehicles was executed by Detective TJ Smith and Crime Scene Investigator Sergeant Angela Matthews. In the Tahoe Smith discovered bright orange crumbs consistent with Doritos crumbs on the front passenger seat and floorboard. In the back seat armrest, there was a white Styrofoam container with nachos inside. These nachos were made with regular tortilla chips and not Doritos. The Tahoe also contained three bottles: a water bottle in the front armrest, a glass bottle in the rear armrest near the nacho container, and a water bottle on the floor of the rear passenger seat.

¶ 23    Matthews testified that the Malibu had seven circular defects consistent with bullet holes

located in the exterior trunk lid, the bumper, and also the exterior, passenger side taillight. There were also three defects discovered in the interior of the trunk and rear seat, consistent with bullets traveling from the interior of the trunk into the passenger compartment. She also recovered a projectile from the floor of the Malibu's trunk.

¶ 24    Matthews further testified that the Tahoe had a defect in its windshield and that the damage to the glass was consistent with a projectile traveling into the vehicle. There was also a ricochet defect located in the interior rear roof area of the Tahoe, and a projectile and metal fragment were found in the rear cargo area. Matthews also searched the Tahoe for fingerprints in the interior of the front passenger side and the exterior of the front and rear passenger side. She found one print on the exterior rear passenger side and six on the exterior front passenger side. She also took DNA swabs from the front interior passenger side door handle, from the handle area on the front dash of the Tahoe. None of the objects or food items were taken from the Tahoe for DNA testing or fingerprinting. No further evidence was presented regarding the fingerprints and DNA swabs obtained by Matthews.

¶ 25    Christina Davison of the Illinois State Police testified as an expert in firearms identification. She identified the .40-caliber shell casings as being fired from the Ruger recovered from the Malibu. She also identified the two bullets recovered from Carew's body and the bullet recovered from the Malibu as belonging to the class of bullets that includes 9-millimeter. She determined that those three bullets had been fired by the same gun, and that they were not fired from the Ruger, as it is a different caliber. She also determined that the nine 9-millimeter shell casings had all been fired by the same gun. However, as she did not have the gun that fired the bullets and/or shell casings, she could not say definitively whether the 9-millimeter shell casings and bullets had been fired from the same gun.

¶ 26                          D. Brown's Statements to Police

¶ 27    After being taken into custody, Brown was taken to a hospital where he was treated for hypothermia. On the way to the hospital Officer Phillip Behnke read Brown his *Miranda* rights. After being treated at the hospital, Brown was taken to the Freeport Police Department where he was interviewed by Behnke and Detective Tony Bradbury. The interview was recorded and for much of it Brown spoke very softly and would often go for long periods of time without answering questions. During several portions of the recording, Brown was inaudible, and he appeared to be struggling to articulate his thoughts.

¶ 28    Brown stated that he was sitting in the middle back seat of the Tahoe. He identified "Foody," a nickname for Moore, as driving and a person he called "Lord" was sitting in the front passenger seat. He recalled eating Doritos, seeing a red car, and something black pointing at him. He then heard gunshots in the area of Walnut Avenue and Broadway Street which prompted him to get down. He tried to exit the vehicle, but it was moving too fast. He denied shooting a gun and stated he did not see anyone else shoot a gun. He admitted to having marijuana in his pocket. Brown claimed that because of a previous incident where he had been shot 19 times, he had severe nerve damage and could not stick a body part out of or lean out of a car window.

¶ 29    Brown could not recall where Lord got out of the Tahoe. When asked whether Lord got out at Broadway Street and Walnut Avenue, or when the Tahoe stopped near the river, Brown answered ambiguously, "I think he got out before that." Brown did not testify at trial.

¶ 30                          E. Moore's Statements and Testimony

¶ 31    On January 23, 2021, Moore gave an initial statement in which he declared that neither he nor Brown had a gun, and neither of them shot at the Malibu. Moore was then incarcerated and charged. Afterward Bradbury received a phone call from a corrections officer, as well as a

voicemail from one of Moore's associates, and another call from an unidentified person, that Moore wanted to speak with him.

¶ 32   On January 24, 2021, Moore gave a recorded statement to Bradbury and Krieger wherein he stated that on the date of the shooting he and Brown were in the Tahoe, he was driving, and Brown was in the passenger seat. Traffic was slow and they were stopped at the intersection of Washington Place and Walnut Avenue when Brown told him to go left. He turned left behind a red car. The passenger side door of the red car opened, and someone fired three or four shots at the Tahoe. Brown then reached his right arm out the passenger side window of the Tahoe and returned fire near Pleasant Street and Walnut Avenue. Brown's gun was all black. Moore claimed that Brown could not have leaned out the window as he had been shot 19 times and could not move fast. He stated that once the police got behind them, he got tunnel vision and was no longer thinking about the red car firing at them.[1] Near Walnut Avenue and American Street, the passenger door of the red car opened again and fired more shots at the Tahoe, with a round going through the windshield. Moore also stated that he had been told by Brown that he had thrown the gun out near U.S. Route 20 and Galena Avenue after almost colliding with a semi-truck. Bradbury and numerous other officers went to that area to try and find the gun but were unable to find it.

---

[1] Both Brown and the State have transcribed this part of Moore's statement incorrectly in their briefs as, "I know the police behind us, so I ain't thinking about doing no shooting no more." The correct transcription is "Once they got behind me g********, I don't know what the f*** to do. I just had tunnel vision. I'm just going straight. You know what I'm saying? I ain't thinking about dude and them. I know the police behind us, so I ain't thinking about dude and them shooting no more. You feel what I'm saying?"

Bradbury testified that Moore's explanation for the changes in his statement was that initially he did not want to be labeled a snitch, but that he did not want to go to jail or be charged with something he did not do because he was not the shooter.

¶ 33    At the time of trial Moore had been found guilty on charges related to the events of January 23, 2021, but had not yet been sentenced. When asked to testify against Brown, he invoked his Fifth Amendment right against self-incrimination and was given use immunity for his testimony. He had received no deal for leniency in exchange for his testimony.

¶ 34    Moore testified as follows. Brown arrived at Moore's home driving the Black Tahoe around 1 p.m. Moore then got in the Tahoe and started driving. They went to Zay's store to buy some chips. He bought nachos that came in a white Styrofoam container but did not recall buying any drinks. Brown bought Doritos which were also placed in a white Styrofoam container. He did not recall if they already had drinks in the car.

¶ 35    They eventually made their way to Iroquois Street and Walnut Avenue,[2] and Brown was in the passenger seat and Moore was driving. There was no one else in the car and neither he nor Brown went into the back seat. Moore had his nachos in his lap and Brown told him, "Turn left Lord, turn left." Moore testified that Lord was not his nickname, but that it was something Brown called people. They then turned left (south) onto Walnut Avenue behind a red car, which opened its passenger door and began firing at the Tahoe. In response he froze up and tried to swerve to avoid getting hit. He also turned to place his nachos in the back seat. Afterward, the police began following them. Moore continued south on Walnut Avenue because that was the direction of his

---

[2] Washington Street merges with Iroquois Street right before Walnut Avenue, at which point Iroquois Street becomes Washington Place.

house, and that was where he had been going to. In the area of American Street and Walnut Avenue, the red car again opened its passenger door and fired at the Tahoe.

¶ 36    He did not see Brown holding a gun until after the shots were fired, when he saw Brown holding a semi-automatic pistol. Moore also testified that he did not see Brown with a gun until they got close to American Street and Walnut Avenue. He testified that he did not actually see Brown fire the gun, and before that, he did not know Brown had a gun. Brown later told him that he threw the gun out of the Tahoe after they were almost struck by the semi-truck turning onto U.S. Route 20, however he did not see Brown get rid of the gun.

¶ 37    When the Tahoe got stuck at the river, both he and Brown exited the front passenger door. While Moore acknowledged that Brown could not move very fast, he stated that Brown got out of the Tahoe quickly. He testified that he did not exit from the driver's side because he saw a police officer with his gun out and was worried about being shot.

¶ 38    The trial court found Brown guilty on both the charge of aggravated discharge of a firearm within 1000 feet of a school and aggravated battery with a firearm. Brown was sentenced on both counts to 17 years in prison, to be served concurrently, and three years mandatory supervised release. Brown timely appealed.

¶ 39                                    II. ANALYSIS

¶ 40    Brown raises two primary arguments on appeal. The first is that Moore's testimony was so flawed that the trial court could not have reasonably accepted any part of it as true. The second is that in the absence of Moore's testimony there can be no reasonable inference that Brown was the shooter.

¶ 41    When considering the sufficiency of the evidence, a reviewing court, viewing the evidence in the light most favorable to the State, must consider whether any rational trier of fact could have

found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). A reviewing court will not substitute its judgment for that of the trier of fact on the credibility of witnesses or the weight of the evidence. *People v. Cooper*, 194 Ill. 2d 419, 431 (2000). The same standard applies whether the evidence is direct or circumstantial (*People v. Thomas*, 178 Ill. 2d 215, 232 (1997)), and whether there is a bench or jury trial (*People v. Howery*, 178 Ill. 2d 1, 38 (1997)). Therefore, a conviction will be reversed only if the evidence is so unreasonable, improbable, or unsatisfactory that it justified a reasonable doubt of the defendant's guilt. *People v. Wheeler*, 226 Ill. 2d 92, 115 (2007).

¶ 42                                    A. Moore's Testimony

¶ 43     Brown argues that Moore's testimony was inconsistent within itself and with Moore's prior statements. On January 23, 2017, he told Officer Bradbury that neither he nor Brown had a gun and that nobody in the Tahoe fired at the Malibu. Then on January 24, 2017, after being charged, Moore stated that a passenger in the Malibu fired at the Tahoe first, and Brown responded by returning fire. Finally, at trial Moore testified that he saw Brown holding a gun, but never saw him fire the gun.

¶ 44     Further, Brown argues that various inconsistencies in Moore's testimony render it unreliable. First, Brown argues that Moore gave differing accounts of when he saw Brown holding a gun, first stating that he saw the gun at Walnut Avenue and Pleasant Street and then stating that he first saw the gun at Walnut Avenue and American Street. Further, Moore gave different accounts of his initial reaction to the shooting, first that he froze up and swerved to avoid the shots, but later he testified that when the shots were fired, he put the nachos he was eating in the back seat. Moore also testified that Brown drove the Tahoe to pick him up, and that Brown never drove the Tahoe that day. Moore testified that both he and Brown bought chips that came in white

Styrofoam containers, but there was only one Styrofoam container found in the car. Likewise, Moore testified that all they bought were chips, yet two water bottles were found in the car, one in the back and one in the front. Moore also claimed that he followed the Malibu despite just being shot at because, "that was the direction of [his] house and that's where [he] was headed to." Further, despite the difficulty Brown had in getting around due to having been shot multiple times in the past and Moore acknowledging that Brown could not move very fast, he claimed that Brown exited the vehicle quickly.

¶ 45    Brown cites two cases in support of his contention that Moore's testimony must be disregarded: *People v. Washington*, 375 Ill. App. 3d 1012 (2007); and *People v. Johnson*, 2021 IL App (1st) 171885. In *Washington*, the defendant was convicted of attempted first-degree murder, aggravated battery, and aggravated discharge of a firearm in relation to a drive-by shooting wherein shots were fired from the driver side window of a van. *Id.* at 1013, 1018. The defendant was one of four suspects found inside the van and was taken into custody along with three others, Rayford, Phillips, and Ingram. *Id.* at 1015. At trial the State argued that the defendant should be found guilty because he was the one who shot the victim, or under an accountability theory as the driver of the van. *Id.* at 1024. There was no objective evidence submitted at trial as to who shot the victim. The only evidence regarding whether the defendant shot the victim consisted of eyewitness testimony from the three other people who were arrested in the van. *Id.* at 1025.

¶ 46    Rayford testified, after receiving use immunity, that the defendant was the shooter, despite giving three prior statements to the contrary alleging at different times that "there was no shooter, he did not remember the shooting, he did not know who the shooter was, but Phillips had the gun, and defendant was the shooter." *Id.* at 1026. While Rayford did not receive any deal for testifying, he admitted he had "a lot to lose" and "did not want to go down for what somebody else did." *Id.*

¶ 47    Phillips initially claimed that no one in the van shot, but after being charged and implicated by the other passengers entered into a "sweetheart deal" with the State to testify against the defendant. *Id.* at 1025-26.

¶ 48    Ingram consistently maintained that Phillips was the shooter and testified only after being granted use immunity. Ingram, however, was the defendant's cousin and Ingram said he would not "trick on his cousin." *Id.* at 1026.

¶ 49    The *Washington* court found there to be no remotely consistent account of the defendant's role in the shooting. *Id.* at 1029. Where two accomplices corroborated on a point, they also contradicted each other on another. *Id.* Because of this there was reasonable doubt as to the defendant's guilt. *Id.*

¶ 50    In *Johnson* the defendant was the driver of a vehicle involved in a drive-by shooting where his passenger shot and killed two men. *Johnson*, 2021 IL App (1st) 171885, ¶¶ 1-2 The defendant was convicted of first-degree murder based solely on a theory of accountability. *Id.* The defendant's conviction hinged upon the testimony of Ware, a witness to the shooting. *Id.* ¶ 78. Ware's testimony at trial was that after observing the shooting, the defendant pulled up to him, rolled down the passenger side window, and pointed a "blackish" revolver at him. *Id.* ¶ 79. Ware's testimony was inconsistent with his prior accounts of the events in that; in two 911 calls he did not report that anyone had pointed a gun at him. *Id.* ¶ 80 Likewise in his initial account to the investigating detective did not include a gun being pointed at him. *Id.* Ware "was also inconsistent regarding whether defendant rolled [] the passenger side window down upon stopping the vehicle, the speed at which Tahoe drove away from the scene, whether he heard the gun click, and how long the vehicle was stopped in front of him." *Id.* ¶ 81. Further, Ware's testimony that there was only one person in the vehicle was contradicted by other undisputed evidence. *Id.* ¶ 82. Finally,

Ware was contradicted by another witness who testified that he saw the passenger holding a silver automatic pistol and that the vehicle did not stop, but instead moved at a steady rate of speed. *Id*. The *Johnson* court held that Ware's testimony was too unreliable to support a conviction because of "the undisputed inaccuracy on a central aspect of Ware's account, his changing renditions, and the extensive impeachment of his testimony***." *Id.* ¶ 83.

¶ 51    We disagree with Brown's contention that Moore's testimony was as flawed as the testimony in *Washington* and *Johnson*. To begin, Brown's reliance on *Washington* is misplaced. *Washington* dealt with a situation in which the only evidence supporting defendant's conviction was the contradictory and inconsistent testimony of his three accomplices. In the instant case, there is circumstantial evidence corroborating aspects of Moore's testimony and which implicates Brown. Further, Moore's testimony was not contradicted by inconsistent statements of additional co-defendants. Instead, Brown is ultimately challenging Moore's credibility. While *Johnson* is more on point in this respect, Moore's account was not contradicted by another disinterested witness, and there were readily apparent explanations for why Moore's story varied on the few times he told it, as opposed to the "omission of critical facts at a time when a person normally would have disclosed them" (*id.* ¶ 80) as present in *Johnson.*

¶ 52    Moore gave three accounts of the shooting. Immediately after his arrest he denied that anyone in the Tahoe fired a gun. The day after the shooting, January 24, 2017, after receiving his charges, Moore reached out to Detective Bradbury indicating he wished to talk. At this point, faced with the seriousness of his situation, Moore was eager to cut a deal and cooperate. Moore then gave a statement in which he positively described Brown firing at the Malibu. Finally, Moore testified at Brown's trial. At that point he had been found guilty and was awaiting sentencing. No deal was on the table, so there was no longer a benefit to being candid. He no longer wished to

participate but knew the police had his prior statement. Compared to his January 24, 2017, statement, Moore's trial testimony was much more recalcitrant and circumspect. He testified that he saw Brown with a gun but never saw him fire it and he stated that he could not recall many of his prior statements.

¶ 53     It is for the trier of fact to determine how flaws in part of the testimony affect the credibility of the whole. *People v. Cunningham*, 212 Ill. 2d 274, 283 (2004). As such, even deliberate falsehoods or contradictory testimony will not automatically destroy the credibility of a witness. *Id.*; *People v. Gray*, 2017 IL 120958, ¶ 47. "Where the record is not such that the only inference reasonably drawn from flaws in the testimony is disbelief of the whole, a reviewing court should bear in mind that the fact finder had the benefit of watching the witness' demeanor." *Cunningham*, 212 Ill. 2d at 284.

¶ 54     Here, Moore's testimony itself was not so flawed or inconsistent as to render the whole unworthy of trust or belief. With regard to the point at which Moore saw Brown with the gun, the State argues that Moore's testimony was not that he saw the gun at Walnut Avenue and Pleasant Street, but instead he testified that he saw it after the shots were fired, and then later testified he saw the gun near Walnut Avenue and American Street. The State argues that because Walnut Avenue and American Street is only about six blocks from Walnut Avenue and Pleasant Street and the Tahoe was traveling at high speeds, it would not have taken long for Moore to get to or near American and Walnut Avenue. Reviewing courts may take judicial notice of geographical information acquired from mainstream internet sites such as Google Maps. *People v. Clark*, 406 Ill. App. 3d 622, 633 (2010). Having consulted Google Maps, Walnut Avenue and American Street is approximately a quarter mile south of Walnut Avenue and Pleasant Street. Given that the Tahoe was traveling at a high rate of speed, it would have likely taken less than a minute to travel from

Walnut Avenue and Pleasant Street to Walnut Avenue and American Street. It is also worth noting that in his January 24, 2017, statement Moore clearly identified Brown as firing a gun at the Malibu near the intersection of Walnut Avenue and Pleasant Street, contrary to his trial testimony that he did not see Brown shoot at all and did not notice the gun until after the shots were fired.

¶ 55    As to Moore's initial reaction to the shots being fired, the State argues that Moore's stated reactions were not inconsistent with one another. We agree. Moore could have froze, tried to swerve, and placed his nachos in the back seat all within a short time frame. None of these actions are inherently inconsistent with each other, and Moore's testimony regarding the nachos is consistent with the container of nachos found in the back seat.

¶ 56    With regard to Moore's testimony about Brown driving the Tahoe, Moore testified that Brown drove the Tahoe to Moore's house to pick him up, after which point Moore drove. Later, Moore was questioned about the shooting and subsequent chase, and defense counsel asked, "And you were in control of the Tahoe the entire time, Mr. Brown never drove it?" to which Moore replied, "No." Given the context of the question it is apparent that Moore was speaking about who drove the Tahoe during the time period of the shooting and subsequent chase.

¶ 57    The State likewise maintains that the fact that only one white Styrofoam container, and not two, was found does not obliterate Moore's testimony. Moore testified that he bought nachos and Brown bought Doritos and that both came in a white Styrofoam container. A white Styrofoam container of nachos was found in the back seat, and what appeared to be Dorito crumbs were found on the floor of the front passenger seat. Both Moore and Brown stated that they had bought and were eating chips. As such, there is corroboration for most of Moore's testimony on this point. The fact that Brown's chips may or may not have come in a Styrofoam container is ultimately a minor detail of little consequence. Likewise, the presence of water bottles in the car does not

diminish the credibility of Moore's testimony. The water bottles may have already been in the vehicle, which would not impugn Moore's testimony that he and Brown only bought chips.

¶ 58    As to Brown's ability to exit the Tahoe quickly, while there was some evidence presented regarding Brown's difficulty moving as a result of being shot 19 times, there was no testimony from a doctor or person familiar with Brown regarding the full extent of his physical limitations. What is known is that Brown exited the Tahoe, made his way down the brush covered bank of the river, and waded chest deep into its water in under a minute. Further, while Brown may have had difficulty moving and doing things like getting into and out of a vehicle, the fact that he was fleeing apprehension by police would have provided the impetus for him to move as quickly as possible despite pain or discomfort. Additionally, the fact that Brown had difficulty getting into the rear of a police car after plunging into frigid water, being apprehended, and then handcuffed is hardly indicative of his ability to exit a vehicle unfettered while not suffering from hypothermia. Accordingly, it is not unreasonable that Moore would testify that Brown had difficulty getting about, but still fled the Tahoe quickly.

¶ 59    Turning to Brown's argument regarding the fact that police were unable to locate a gun at the location Moore identified as the place where Brown discarded it, there is evidence that Brown and Moore were in communication with outside persons immediately prior to their apprehension. As such, it is possible Brown or Moore were able to tell a third party where the gun had been discarded and for that person to have recovered the gun before police searched the area the next day. Moore was heard telling someone that the police had got him, and he was going to jail. Brown was seen holding a black object which could have been a cellphone. Additionally, the white Chrysler identified by Stovall as being driven by Euell was nearby when the Tahoe stopped. That area of East River Road is a relatively remote country road, with the portion to the east of Rock

City Road being a dirt road, and it is unlikely that Euell would be at that location at that time by mere coincidence. It is far more likely that Euell was communication with someone in the Tahoe. Additionally, the fact that Moore identified one of the only spots where officers lost site of the Tahoe as the location where the gun was disposed tends to corroborate his testimony.

¶ 60    We recognize that there are flaws in Moore's testimony. His January 24, 2021, statement was much more forthcoming and positively identified Brown as the shooter, describing how he returned fire on the Malibu near Walnut Avenue and Pleasant. In contrast, his trial testimony was more reserved. However, the broad details of his testimony were consistent and corroborated by external evidence. Moore testified that he was the driver of the Tahoe from the relevant period immediately prior to the shooting through the end of the chase when the Tahoe crashed. This is corroborated by Brown's statement where he identified "Foody" as the driver, as well as Krieger's squad footage which showed Moore driving the Tahoe. Moore testified that prior to the shooting he and Brown bought chips. This is also corroborated by Brown who said he had been eating Doritos, as well as by the discovery of the nacho container and Dorito crumbs in the Tahoe. Moore further testified that Brown had a gun and that there was no one else with them in the Tahoe. As such, Moore's trial testimony was not so flawed or unreliable that no reasonable trier of fact could have found it credible.

¶ 61                                    B. Other Evidence

¶ 62    Brown argues that, outside Moore's testimony, there was no evidence that he possessed a firearm, let alone fired one at the Malibu. The police never located a 9-millimeter firearm, despite searching the area Moore identified as where Brown disposed of the gun. Brown argues that without the gun, there is no way to connect the 9-millimeter shell casings to the bullets that struck Carew. None of the police officers involved in the chase saw Brown with a gun. Further, neither

the Tahoe nor Brown were tested for gunshot residue. As such, Brown argues that there is a reasonable doubt as to whether Brown committed the charged offenses.

¶ 63    Brown further argues that there was evidence of a third person in the Tahoe. When Wagand arrived at the river he radioed that there were three people and identified where they all went: one ran east, one ran towards the water, and one returned to the Tahoe. Wagand also identified where the third passenger went saying, "He took off under the bridge in the water." Brown also urges that we should reject the State's argument that Wagand became somewhat confused under the severity of the circumstances, as he was able to pause and evaluate which suspect to pursue, selecting Moore because he was heading in a direction where no other officers were coming. Brown also argues that Hill also stated he saw three individuals. Further, both passenger doors of the Tahoe were open, suggesting a third person exited from the backseat.

¶ 64    Brown also argues that the failure to test the various food and drink items in the Tahoe constitutes a weakness in the State's argument.

¶ 65    Considering all of the evidence in the light most favorable to the State, there was sufficient evidence to find Brown guilty beyond a reasonable doubt. There was evidence that a 9-millimeter gun was fired at the Malibu from the front passenger window of the Tahoe in the area of Walnut Avenue and Pleasant Street. Krieger and Anderson, who were in the area of Walnut Avenue and Broadway Street, heard shots coming from the north in the area of Walnut Avenue and Pleasant Street, and shortly afterward observed the Malibu followed by the Tahoe traveling south on Walnut Avenue at a high rate of speed. Nine 9-millimeter shell casings were found near the west curb of Walnut Avenue across from the playground area of St. Joe's Elementary School. This is consistent with shots being fired from the passenger side of a vehicle traveling south on Walnut Avenue. Two 9-millimeter bullets were recovered from Carew's body, and one was recovered from the Malibu.

The Malibu had seven circular defects consistent with bullet holes located in the exterior trunk lid, the bumper, and also the exterior, passenger side taillight. The general placement of these shots was concentrated on the passenger side of the vehicle, consistent with shots being fired from the passenger side of a pursuing vehicle. The footage from Larmoreux's home and Anderson's squad camera shows the front passenger side window was down. Given that the shooting occurred on a cold January day, the open window was consistent with the passenger lowering the windows in order to shoot from it. While the firearm expert could not say with certainty that the recovered 9-millimeter bullets were fired from the same gun that fired the shell casings, there was also nothing suggesting that they were not fired by the same weapon, and under the circumstances it would have been reasonable for the trial court to conclude that the bullets and shell casings came from a 9-millimeter weapon fired from within the Tahoe.

¶ 66    There is also evidence that Moore was the driver of the Tahoe. He admitted to driving the Tahoe. Anderson's squad camera showed that Moore was driving the vehicle. Brown identified Moore by his nickname, Foody, as the driver. As the driver, it is unlikely that Moore could have reached out the passenger side window to fire on the Malibu. Nor would it have been natural to move over to the passenger side of the vehicle to fire at the Malibu.

¶ 67    Brown contends that there were three people in the vehicle, and there is some evidence to support that contention. Wagand initially stated that three individuals had exited the Tahoe. The front and rear passenger doors were open. If Moore's account that he and Brown were the only ones in the car and that they both exited from the front passenger's side door is to be believed, then there would have been no need to exit from the rear passenger door. Additionally, a car similar to one driven by Euell, the owner of the Tahoe, was seen heading eastbound on East River Road before pulling out southbound onto Rock City Road, turning around and heading westbound on

East River Road. In Wagand's body camera footage, as Moore was being apprehended, he can be heard apparently speaking to someone, and Brown was seen holding something black which could have been a cellphone when he was in the river. It is possible that Brown or Moore were in contact with someone and were trying to arrange an escape. Brown contends that it would have been possible for a third party to flee under the bridge and enter the white Chrysler.

¶ 68    With regard to a third person escaping and entering the white Chrysler, it appears that if a third person were to have escaped, that would have been the only practical means to avoid detention. The area between the Tahoe and the bridge was well observed by the officers at the scene and by the squad cameras equipped in the police vehicles. Wagand arrived first and could observe the Tahoe and the river. He then left to pursue Moore, leaving the area partially unobserved, although his squad camera still had the front of the Tahoe in view. As such the only means of evading observation and capture would have been to enter the river. From there a third person would have had to have made their way westward towards the direction of the bridge, since the area east of the bridge was well observed. Further, they would have had to reach the cover of the bridge in a matter of seconds, based on the squad camera footage, as well as the fact Hill arrived on the scene approximately eight seconds after Wagand left. Likewise, Summers was observing the river from his vantage on the bridge as well. Additionally, the river was flooding at the time, and the bridge was upstream of the Tahoe. So, this third person would have had to make it into the flooded river and make their way upstream through frigid water, all in matter of seconds, and then make their way out from under the other side of the bridge and up the bank to an awaiting vehicle, all of which would be unobserved by the numerous officers in the area.

¶ 69    Further, there was evidence that Brown and Moore were the only ones in the Tahoe. Moore testified that he and Brown were the only ones in the Tahoe. When the Tahoe eventually came to

a stop, only Moore and Brown were apprehended. When asked how many people were in the Tahoe, Moore answered that there were only two. When Brown was asked by Wagand, "How many were in the car with you?" he responded, "Just two." After a thorough search lasting around an hour involving officers from the Freeport Police Department, Stephenson County Sheriff's Office, various volunteer firefighters, a K-9 unit, and a boat crewed by volunteer firefighters and officers, no third person was located.

¶ 70   Considering all of the evidence, it would not have been unreasonable to conclude that there were only two people in the Tahoe. Even setting aside Moore's testimony, there is sufficient circumstantial evidence to have found defendant guilty beyond a reasonable doubt. There is evidence that a 9-millimeter gun was fired out of the passenger side of the Tahoe, within 1000 feet of a school, and that three of the bullets fired hit Carew causing him significant bodily harm, including the loss of one of his kidneys. There is evidence that only two people were in the Tahoe, Moore and Brown, and that Moore was the driver. As the driver it would have been impractical and unnatural for Moore to fire out the passenger side window, leaving Brown as the shooter. When the circumstantial evidence is taken along with Moore's testimony, there was clearly sufficient evidence for the trial court to find defendant guilty beyond a reasonable doubt of aggravated discharge of a firearm within 1000 feet of a school and aggravated battery with a firearm.

¶ 71                                     III. CONCLUSION

¶ 72   For the reasons stated, we affirm the judgment of the circuit court of Stephenson County.

¶ 73   Affirmed.