NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 250570-U

NO. 4-25-0570

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 2, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Stephenson County |
| KAHILL G. BROWN, | ) | No. 17CF33 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Glenn R. Schorsch, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Vancil and Grischow concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The appellate court affirmed, finding the trial court's denial of defendant's petition for postconviction relief at the third stage of postconviction proceedings was not manifestly erroneous.

¶ 2     Following a third-stage evidentiary hearing, the trial court denied defendant Kahill G. Brown's petition for postconviction for relief pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2024)). On appeal, defendant argues the court erred when denying his petition. We disagree and affirm.

¶ 3                                    I. BACKGROUND

¶ 4     In February 2017, defendant was charged by information with aggravated discharge of a firearm within 1,000 feet of a school (720 ILCS 5/24-1.2(a)(2) (2016)) and aggravated battery with a firearm (*id.* § 5/12-3.05(e)(1)). The matter proceeded to a bench trial in January 2018, and the trial court found defendant guilty of both charges. On direct appeal,

defendant challenged the sufficiency of the evidence to prove his guilt beyond a reasonable doubt. *People v. Brown*, 2021 IL App (2d) 180587-U, ¶ 2. The appellate court on direct appeal provided a detailed recitation of the facts. We summarize only those facts relevant to this appeal.

¶ 5                                    A. Bench Trial and Sentencing

¶ 6            On January 23, 2017, Freeport police officers Matthew Anderson and Timothy Krieger were driving separately when they heard several gunshots. *Id.* ¶ 5. The officers observed a red Chevrolet Malibu followed by a black Chevrolet Tahoe traveling at high rates of speed and gave pursuit. *Id.* ¶ 6. The vehicles eventually split up, and Anderson followed the Malibu until it stopped. *Id.* ¶¶ 7-8. John Carew exited the rear passenger door of the Malibu and had multiple gunshot wounds. *Id.* ¶ 8. The Malibu sped off. Carew did not know who shot him and did not answer Anderson's questions about who was in the Malibu or the Tahoe. *Id.* Anderson stayed with Carew until emergency medical services arrived. *Id.*

¶ 7            When another officer joined the pursuit, Officer Krieger then pursued the Malibu until it stopped and its two occupants, Paris Williams and Damon Shipp, were taken into custody. *Id.* ¶ 11. A .40-caliber SR 40 Ruger handgun was recovered on the driver's side floor of the Malibu. *Id.*

¶ 8            During the chase, security camera footage showed "the Tahoe's windshield was intact and the front passenger side window was down." *Id.* ¶ 6. Video from Anderson's police vehicle showed "[t]he front passenger window of the Tahoe was down, and someone could be seen driving the vehicle. However, no one was visible in the front passenger seat." *Id.* ¶ 9. The Tahoe eventually became stuck in a ditch on the north bank of the Pecatonica River. *Id.* ¶ 12. Officer Ryan Wagand stated he observed three people exit the Tahoe; however, he also stated it was possible he only saw two people exit the vehicle. *Id.* ¶ 13. Wagand saw one individual run

south into the river and another run east. *Id.* The individual who ran east was later identified as Marco Moore and was taken into custody by Wagand. *Id.* Officer Douglas Hill arrived and observed defendant in the river and subsequently took him into custody. *Id.* ¶ 14.

¶ 9        Officers continued to search the area for the third individual Wagand believed he had seen. *Id.* ¶ 18. "[Officer Robyn] Stovall asked Moore how many people were in the vehicle, and he said there were only two, that he was the driver and [defendant] was in the passenger seat." *Id.* Defendant also stated only two people were in the vehicle. *Id.* When Wagand confronted defendant about the suspected third person running through the water, defendant stated, "That was me." *Id.* No third individual was ever located.

¶ 10        The physical evidence included two bullets removed from Carew, nine 9-millimeter cartridge cases recovered from the roadway near St. Joseph Elementary School, and five .40-caliber cartridge cases. *Id.* ¶¶ 20-21. The Tahoe was searched and contained "bright orange crumbs consistent with Doritos crumbs on the front passenger seat and floorboard. In the back seat armrest, there was a white Styrofoam container with nachos inside." *Id.* ¶ 22. A firearms expert testified the .40-caliber cartridge cases were fired from the Ruger recovered from the Malibu. *Id.* ¶ 25. Additionally, all of the 9-millimeter cartridge cases and the bullets recovered from Carew's body had been fired from the same gun, which was never recovered. *Id.*

¶ 11        Defendant told police he was seated "in the middle back seat of the Tahoe." *Id.* ¶ 28. He stated Moore was driving and a person named "Lord" was in the front passenger seat. *Id.* He said he was eating Doritos prior to hearing gunshots. *Id.* He denied shooting a gun or seeing anyone else shoot a gun. *Id.* Defendant "could not recall where Lord got out of the Tahoe." *Id.* ¶ 29.

¶ 12        Moore initially denied he or defendant had or fired a gun. *Id.* ¶ 31. Moore gave a

second statement, wherein he said he was driving the Tahoe, and defendant was in the passenger seat. *Id.* ¶ 32. After the Malibu fired at Moore and defendant, Moore recalled defendant "reached his right arm out the passenger window" and returned fire. *Id.* He recalled defendant throwing the gun from the vehicle, but police were unable to locate the gun where Moore said it was disposed. *Id.* Detective Tony Bradbury testified Moore changed his statement to police because "initially [Moore] did not want to be labeled a snitch, but that he did not want to go to jail or be charged with something he did not do because he was not the shooter." *Id.*

¶ 13    "At the time of trial[,] Moore had been found guilty on charges related to the events of January 23, 2021, but had not yet been sentenced." *Id.* ¶ 33. Moore was given use immunity for his testimony and stated defendant, driving the Tahoe, arrived at Moore's home that afternoon. *Id.* ¶ 34. Moore took over driving the Tahoe and they went to the store, where Moore "bought nachos that came in a white Styrofoam container." *Id.* He recalled defendant purchasing Doritos, "which were also placed in a white Styrofoam container." *Id.* He stated defendant was in the passenger seat. *Id.* ¶ 35. He did not know defendant had a gun until after he fired it. *Id.* ¶ 36. He did not recall seeing defendant actually fire the gun. *Id.* He said defendant told him the gun was thrown out of the vehicle when the Tahoe almost struck a semitruck, which was also the only moment police lost sight of the Tahoe. *Id.* ¶¶ 12, 36. He did not actually observe defendant dispose of the gun. *Id.* ¶ 36.

¶ 14    The trial court found defendant guilty of both counts and sentenced him to 17 years' imprisonment on each, to be served concurrently. *Id.* ¶ 38.

¶ 15    B. Direct Appeal and Postconviction Proceedings

¶ 16    On appeal, defendant argued the evidence was insufficient to prove his guilt beyond a reasonable doubt based on Moore's flawed testimony. *Id.* ¶ 40. The appellate court

recognized the flawed nature of Moore's testimony and his differing accounts of the shooting. *Id.* ¶¶ 43-60. The court explained Moore's January 24, 2021, statement to police was "forthcoming and positively identified [defendant] as the shooter." *Id.* ¶ 60. The broad details of his testimony "were consistent and corroborated by external evidence." *Id.* Specifically, the court noted Krieger's police vehicle camera captured Moore driving the Tahoe, the Doritos and nacho container were visible during the search of the Tahoe, and that defendant had the gun when only Moore and defendant were in the Tahoe. *Id.* The court found the circumstantial evidence along with Moore's testimony was sufficient to prove his guilt. *Id.* ¶ 70.

¶ 17        In November 2020, while his direct appeal was still pending, defendant filed a *pro se* petition for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2020)), alleging, *inter alia*, actual innocence based upon newly discovered evidence. Specifically, the petition alleged Moore never witnessed defendant possess or discharge a firearm on the date of the incident. Attached to the petition was an affidavit from Moore averring he never witnessed defendant possess or shoot a gun. An affidavit from defendant averred there were three individuals in the Tahoe: Moore as the driver, defendant, and Craig Holloway in the front passenger seat, who was the actual shooter. Later that same month, defendant supplemented his petition with an additional affidavit from Moore wherein Moore also alleged Holloway was the actual shooter. In February 2022, defendant, through counsel, supplemented his petition again with an affidavit from Maurice Williams, who averred he was walking down the street on January 23, 2017, during the shooting and witnessed the Tahoe drive past him. He recognized the driver as Moore, saw a "front seat passenger who was a black male with long dreadlocks that [he] did not recognize," and did not see defendant in the vehicle.

¶ 18          In November 2022, defendant filed a motion to have his section 2-1401 petition recharacterized as a postconviction petition, which the trial court granted. In March 2023, defendant filed a *pro se* postconviction petition, alleging, *inter alia*, actual innocence. In April 2024, new defense counsel was appointed to assist defendant. In September 2024, defendant, through counsel, filed an amended petition, alleging actual innocence. The petition specifically relied on defendant's initial claim that Holloway was the actual shooter. The petition stated Moore's recanted testimony and Williams, as an independent witness, corroborated defendant's account. In response, the State conceded the matter should proceed to a third-stage hearing.

¶ 19          An evidentiary hearing occurred in February 2025. Counsel for defendant initially moved to continue the matter based on Moore requesting to consult with an attorney prior to testifying. The State noted Moore's affidavits in the postconviction proceedings were materially inconsistent in that he had first averred no one in the vehicle possessed a gun but then stated in a second affidavit Holloway was in the vehicle with a gun. Additionally, the State noted Moore's previous statements to police and trial testimony were materially inconsistent with his recent affidavits, such that he may commit perjury if called to testify. The trial court took a brief recess for Moore to speak with defendant's counsel. Moore also spoke with the Stephenson County public defender. When the hearing resumed, defendant called Moore to testify. Defendant requested a continuance so that Moore could consult with an attorney prior to testifying. Ultimately, defendant agreed to bifurcate the hearing, and Moore left without testifying.

¶ 20          Defendant testified he stood behind his affidavit from October 2020 averring Holloway was the actual shooter. He stated he did not come forward sooner because he had heard Holloway was a "known killer" and he had threatened defendant. When asked if he wished to state anything else to the court, defendant stated the State commented on Moore's "several

inconsistent statements but yet [it] convicted him off the same person. I don't understand that."

¶ 21 On cross-examination, defendant said Holloway entered the Tahoe "[b]efore we got nachos." He said Holloway sat in the front passenger seat and he sat in the back seat, directly behind Holloway. When asked if he recalled the gunshots fired from the Tahoe at the Malibu, defendant stated he did not. He said after he heard the shots, he "just blacked out." He said he did not "know where the shots were coming from[,] but [he] heard the shots." He recalled, when the Tahoe stopped near the Pecatonica River, Holloway was still in the front passenger seat, and he was still in the back seat. He recalled getting out of the vehicle. As for Holloway, defendant said, "I don't know what he did. I can't tell you what he did or didn't do." He was "unable to recall what actually happened, because all [he knew] is what ya'll said in trial." He said he fled after the Tahoe stopped out of instinct, despite having done nothing wrong. He recalled seeing "[e]verybody" run. He then stated he did not see Moore run but recalled it from a video played at his trial. He said Holloway "exited the vehicle and ran. I don't know which way he ran." He recalled last seeing Holloway as he exited the vehicle. Defendant recalled exiting the vehicle and entering the river, but he did not see anyone else. He did not know if Holloway had run into the river but reiterated he did not see anybody. When asked about Holloway having a gun on the date of the incident, defendant said, "According to ya'll. I don't know. I ain't never see no gun. I don't know what that man had." When asked if he recalled stating in his affidavit he feared for his safety regarding Holloway, defendant responded, "I recall the police officer saying that he seen a man with dreads exit the passenger side of the Tahoe and run towards the river. I recall that." The State noted defendant's definitiveness in the affidavit that Hollway was the shooter, but during his testimony, he could not recall details of the shooting. Defendant said, "I heard shots, and that's all I know." He did not know where the shots were coming from. When asked if

Holloway was the shooter, defendant said, "I don't know who was doing what."

¶ 22 When confronted again about the affidavit, defendant said "that's what [he] was told" by Moore. The State noted that in his affidavit, Moore said no one in the Tahoe had a gun. When asked if he believed someone in the vehicle had a gun, defendant said he "never seen a gun." He reiterated he blacked out after hearing gunshots. He did not know if there was a gun in the Tahoe. He did not know if anyone fired a gun from the Tahoe. When asked who Holloway was, defendant said he was someone he met the day of the incident, and had not seen him since. He stated he knew Holloway was a killer by "[w]ord of mouth" and did not know anybody who knew Holloway personally.

¶ 23 The trial court subsequently inquired with defendant. Defendant denied knowing any person Holloway had killed. The court noted defendant's affidavit said he was seated behind Moore, the driver, but his testimony was that he was seated behind Holloway, the passenger. Defendant said he was sitting behind both of them "because my body—I was uncomfortable in the back seat, so I shift around a lot." He said the nachos were in the back seat "in the tray holder." He also did not know whether he had heard gunshots from within the Tahoe. The court noted defendant's affidavit stated Holloway had run to a white car, but his testimony was he did not see where anyone ran. Defendant said he did not know which direction Holloway ran. He then stated he saw Holloway run toward the white vehicle.

¶ 24 The State resumed its cross-examination. Defendant recalled Holloway had run to a white car close to the river and under the bridge. On redirect examination, defendant stated he was shot 17 times a few months prior to the incident and was still recovering. Defendant said he knew neither he nor Moore shot a gun, which only left Holloway as the possible shooter.

¶ 25 The hearing resumed in April 2025. Moore did not testify, and defendant rested.

The State provided numerous exhibits from the trial, including the police vehicle video, disputing Williams was in the vicinity to observe the Tahoe as claimed in his affidavit. Another video was shown frame by frame to show "Moore in the driver's seat, you cannot see anyone in the passenger seat." The State rested.

¶ 26　　　　The parties reconvened in June 2025 for the trial court's decision. The court first addressed Williams's affidavit and noted video evidence showed "Williams was not present on the street, that he said he was when with the vehicles passed by, and two, there was not a front passenger *** in the Tahoe being driven by Marco Moore who had dreadlocks. There was absolutely no one in the front passenger seat." The court then noted Moore's numerous prior conflicting statements. The court concluded Moore crafted his statements to seek forgiveness from defendant. The court found Hollway was a made-up individual of whom defendant could not provide any description. The court stated Holloway was fabricated out of officer Anderson's trial testimony that a possible third individual fled the Tahoe. The court added the evidence presented would not change the result upon retrial because Moore's inconsistent statements and Holloway's existence were not credible. The court denied defendant's petition.

¶ 27　　　　This appeal followed.

¶ 28　　　　　　　　　　　　　　　　II. ANALYSIS

¶ 29　　　　On appeal, defendant contends the trial court erred when denying his petition because Moore's affidavits provided newly discovered, material, and noncumulative evidence, which was so conclusive that it undercut confidence in the original guilty verdict.

¶ 30　　　　The Act provides a three-stage process to remedy a defendant's conviction that resulted from a substantial violation of their constitutional rights. *People v. Edwards*, 197 Ill. 2d 239, 243-44 (2001). At the third stage, a defendant has the burden of proving a substantial

showing of a constitutional violation. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). "Following an evidentiary hearing where fact-finding and credibility determinations are involved, the trial court's decision will not be reversed unless it is manifestly erroneous." *People v. Beaman*, 229 Ill. 2d 56, 72 (2008). A trial court's "ruling is manifestly erroneous if it contains error that is clearly evident, plain, and indisputable." *People v. Hughes*, 329 Ill. App. 3d 322, 325 (2002).

¶ 31        Where a defendant makes a claim of actual innocence, our supreme court has explained a substantial showing of a constitutional violation as follows:

> "Substantively, in order to succeed on a claim of actual
> innocence, the defendant must present new, material,
> noncumulative evidence that is so conclusive it would probably
> change the result on retrial. [Citation.] New means the evidence
> was discovered after trial and could not have been discovered
> earlier through the exercise of due diligence. [Citation.] Material
> means the evidence is relevant and probative of the petitioner's
> innocence. [Citation.] Noncumulative means the evidence adds to
> what the jury heard. [Citation.] And conclusive means the
> evidence, when considered along with the trial evidence, would
> probably lead to a different result." *People v. Coleman*, 2013 IL
> 113307, ¶ 96.

¶ 32        Defendant argues the evidence from Moore's affidavit is newly discovered because Moore lied at trial to "lessen his exposure to a lengthy prison sentence and because the actual shooter had threatened him." He argues the evidence is material and noncumulative

because it (1) shows the State's key witness lied, (2) shows there was a third individual in the Tahoe, and (3) squarely addresses the ultimate issue in the case of who fired gunshots from the Tahoe.

¶ 33 Defendant emphasizes the evidence presented at the evidentiary hearing did not need to prove his innocence and was sufficient to warrant a new trial. Specifically, he notes there was no evidence at trial, other than Moore's statements, that defendant possessed or fired a gun. He argues at a retrial, a factfinder would have to consider Moore's affidavit in light of Officer Wagand's observation of possibly seeing a third individual exit the Tahoe. He also argues the evidence showed the possibility that this third individual was in the Tahoe and ran to a white vehicle after the Tahoe stopped. Lastly, he argues there were credible reasons for Moore's false testimony at trial, including his desire to avoid jail and his fear of Holloway.

¶ 34 We are not persuaded by defendant's arguments on appeal. See *Insurance Benefit Group, Inc. v. Guarantee Trust Life Insurance Co.*, 2017 IL App (1st) 162808, ¶ 44 (noting the appellant bears the burden of persuasion as to his or her claims of error). Defendant's actual innocence claim from the beginning was that Holloway was the actual shooter. This claim is built on the affidavits of defendant, Moore, and Williams, as well as defendant's own testimony from the third-stage evidentiary hearing. To be clear, defendant is correct the State's initial case that only defendant could have been the individual with a gun and the only one to have fired it from the Tahoe was highly circumstantial in that it relied solely on Moore's statements to police and testimony at trial.

¶ 35 However, defendant's evidence—on closer examination—is simply not credible. Williams averred he was walking along Empire Street between Float Street and State Street when he observed the Tahoe with Moore driving and a Black male with dreadlocks in the front

passenger seat. Video from Anderson's police vehicle shows the intersection of Float Avenue and Empire Street. Anderson was following the Malibu down Float Avenue when Carew exited the vehicle at the corner of Float and Empire. Seconds later, the Tahoe passed by perpendicularly driving down Empire Street. The front passenger window was down, and the driver could be seen, but there was no front seat passenger. Officer Wagand's police vehicle video showed the Tahoe emerge from Carroll Avenue onto Empire Street heading east before passing Anderson's stopped vehicle at the intersection with Float Avenue. The sidewalks along Empire Street from State Avenue to Float Avenue were visible with no observable pedestrians. These two videos alone directly contradicted the crux of defendant's actual innocence argument by showing any claim of a front seat passenger in the Tahoe was incredible. The last bit of evidence was defendant's hearing testimony. Despite claiming to know Holloway was the actual shooter, defendant was clear, as he stated on multiple occasions, he never saw a gun and he did not know if any gunshots were fired from the Tahoe. In fact, defendant struggled to recall any details related to Holloway.

¶ 36     Ultimately, the trial court found defendant utilized some of the chaos and uncertainty from the incident to invent an alternative culprit. Specifically, Officer Wagand's observation of a potential third individual, the white Chrysler seen on the day of the incident, and Moore's already shaky credibility provided just enough fodder to manifest Holloway. The court concluded the evidence was not credible and would not potentially lead to a different result following a retrial. We cannot say the court's conclusion amounted to a clearly evident, plain, or indisputable error. Therefore, we find the court's denial of defendant's petition was not manifestly erroneous.

¶ 37                    III. CONCLUSION

- 12 -

¶ 38   For the reasons stated, we affirm the judgment of the trial court.

¶ 39   Affirmed.